EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE ) | |
| DEPARTMENT OF NATURAL ) | |
| RESOURCES & ) | Case No.: 1:18-cv-00838-VAC-CJB |
| ENVIRONMENTAL CONTROL ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MOUNTAIRE FARMS OF ) | |
| DELAWARE, INC., ) | |
| a Delaware Corporation, ) | |
| Defendant. ) | |

### COMPLAINT IN INTERVENTION

COMES NOW, Plaintiff-Intervenors Gary and Anna-Marie Cuppels, on behalf of themselves and all others similarly situated (hereinafter "Plaintiff-Intervenors"), who, through undersigned counsel, file this complaint in intervention against Mountaire Farms of Delaware, Inc. (hereinafter "Mountaire").

### PARTIES

1.     Gary and Anna-Marie Cuppels are Delaware residents who live in Millsboro, Delaware.  Plaintiff-Intervenors – at least 695 individuals including the Cuppels – all reside within five miles of the Mountaire poultry processing plant and its wastewater and sludge disposal facilities ("Facilities"), and own or lease properties that rely on the groundwater as a potable water source.  The Cuppels and others among Plaintiff-Intervenors live on or regularly boat, fish, or otherwise pursue recreational activities on the nearby Indian River and its tributaries.

2.     Upon information and belief, Defendant Mountaire Farms of Delaware, Inc. is a Delaware Corporation whose registered agent for the purpose of receiving service of process is

The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 1980.

## **NATURE OF THIS ACTION**

3.     Mountaire owns and operates the Mountaire poultry processing facility in Millsboro, Delaware that includes a poultry slaughterhouse, feed mill, hatchery, wastewater treatment plant, and agricultural lands and forests used for disposal of wastewater and sludge generated by the wastewater treatment plant. *See* Exhibit A (Fig 1).  Mountaire disposes of its wastewater by spray irrigation on more than 900 acres of croplands, and it disposes of its sludges by spraying and injecting them on at least 30 acres of croplands and forests currently, and at least an additional 250 acres historically.  Mountaire also owns and operates a poultry processing facility in Selbyville, Delaware that generates wastewater and sludges that are treated and disposed at Mountaire's Millsboro facilities and lands. Plaintiff-Intervenors and their real properties and their nearby surface waters have been invaded by, exposed to, and suffered damage from dangerous amounts of pollutants released into the air, soil and water as a result of Mountaire's poultry processing operation.

4.     Pursuant to 42 U.S.C. § 6972(a)(1)(B) and 33 U.S.C. § 1365(a)(1), citizens, including Plaintiff-Intervenors, are authorized to bring suit against any person who is the "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, treatment, storage or disposal of any solid or hazardous waste which may present an imminent and substantial threat to human health or the environment" or who has alleged to have violated an effluent standard of limitation of the Clean Water Act.

2

5.      Mountaire processes approximately two million chickens per week and generates more than two million gallons of wastewater and sludge per day.  The waste from the facility includes feathers, dirt, fecal matter, blood, slaughtering wastewater, carcass parts, grit, sand, gravel, flesh, fat, grease chiller wastewater, processing wastewater, cleanup wastewater, and sanitary waste from employees.

6.      Since May 2000, Mountaire has disposed of billions of gallons of highly contaminated wastewater and liquefied sludge on lands near Plaintiff-Intervenors' residences and continues to dispose millions of gallons of such wastes in these locations every day.  The wastewater and sludge has seeped into the groundwater throughout the area, causing nitrates and other contaminants to spread for miles and their concentrations to escalate to dangerously high levels that have contaminated Plaintiff-Intervenors' drinking water wells and caused Plaintiff-Intervenors to suffer health effects. The contaminated groundwater, in turn, has and continues to pollute the adjoining Swan Creek and nearby Indian River, depriving Plaintiff-Intervenors of the use and enjoyment of these surface waters and the enhanced value they should bring to their properties. Through Mountaire's operations and reckless disregard for Plaintiff-Intervenors and the environment, the extent and severity of groundwater contamination has grown and continues to grow. Mountaire's wastewater treatment plant and its spray irrigation and sludge disposal operations also emit dangerous air pollutants, including malodorous hydrogen sulfide and ammonia that reach Plaintiff's residences at levels causing Plaintiff-Intervenors to suffer health effects. Plaintiff-Intervenors and other area residents received no warning or notice of the risks to themselves and their properties.  Plaintiff-Intervenors have suffered health effects, live in fear of future health effects, cannot drink their own water and own properties that are stigmatized by the

contaminated groundwater, air pollution and odors, have lost substantial value and may not be saleable.

### JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), the Resource Conservation and Recovery Act ("RCRA"), codified in 42 U.S.C. § 6901 et seq., and the Clean Water Act, codified in 33 U.S.C. § 1251 et seq.

8.      The Defendants' violations occurred in the State of Delaware.  Venue is proper in the District of Delaware.

### PROCEDURAL POSTURE

9.      On May 2, 2018, Plaintiff-Intervenors provided Mountaire and the Delaware Department of Natural Resources and Environmental Control ("DNREC"), among others, Notice of Intent to Sue Mountaire as required by and pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6972(b)(2)(A) and Clean Water Act ("CWA"), 33 U.S.C. §1365(b)   (hereinafter "Notice") (attached as Exhibit B).   The Notice outlined Plaintiff-Intervenors concerns and explained that Plaintiff-Intervenors have been assisted by a dozen environmental experts and consultants, including experts on wastewater treatment of poultry waste, spray irrigation and land application of poultry waste, groundwater flow and contamination of private wells, contaminated groundwater impact on nitrates in surface water, health effects from excessive nitrates in drinking water, among other topics. *Id.* at p. 2. The Notice explained the imminent and substantial danger caused by Mountaire's practices and requested various forms of relief. *Id.* at pp. 8-9, 11.

10.     Plaintiff-Intervenors also wrote directly to Secretary Garvin, administrator of DNREC, on May 2, 2018 in a letter that further described the work of Plaintiff-Intervenors'

technical experts in the relevant area and requested to be included in discussions of how to remediate the existing groundwater contamination and prevent further problems. Corr. to Sec. Garvin attached at Exhibit C.

11.     In response to the letter, Plaintiff-Intervenors were contacted by Devera Scott, Esquire, the Deputy Attorney General representing DNREC in this matter, but Ms. Scott was noncommittal. The undersigned reiterated the number of technical experts and Plaintiff-Intervenors willingness to make them available to DNREC at no charge to the State of Delaware. Following the telephone conversation, Intervenor-Plaintiffs emailed Ms. Scott a document providing the background and credentials of their technical experts. *See* electronic mail of May 17, 2018 at Exhibit D.

12.     The undersigned sent follow up correspondence to Ms. Scott by electronic mail on May 22, May 25, and May 30, 2018. *See* Exhibit E. Neither Secretary Garvin nor Ms. Scott responded to Plaintiff-Intervenors' invitation to provide the assistance of their technical experts or provided any opportunity for Plaintiff-Intervenors to meet with DNREC.

13.     On Monday, June 4, 2018, DNREC filed simultaneous legal actions, in this court and in the Superior Court for the State of Delaware, Civil Case No. S18M-06-002 RFS, relating to Mountaire's violations of the environmental laws. The factual allegations in the federal and state court proceedings overlap, but the federal case includes allegations of environmental law violations by Mountaire beyond those set forth in the Superior Court for the State of Delaware proceedings. Simultaneous with the filing of the state complaint, DNREC filed a proposed Consent Decree in the Superior Court for the State of Delaware. It is anticipated that a similar or identical consent decree may be filed in this matter.

14.     DNREC's filing in the federal court was meant to preclude, by operation of law, Plaintiff-Intervenors' filing of a complaint for these allegations, pursuant to the federal statutes. 33 U.S.C. § 1365(b)(1)(B), 42 U.S.C. § 6972(b)(2)(C).  However, those same statutes, RCRA and the Clean Water Act, provide that citizens have a right to intervene in the agency-filed federal proceeding.  33 U.S.C. § 1365(b)(1)(B), 42 U.S.C. § 6972(b)(2)(E).   Plaintiff-Intervenors have exercised this right and sought to intervene in the pending federal proceeding where they are assured of a voice.   Plaintiff-Intervenors seek to intervene in this case because "they are so situated that this proceeding may as a practical matter impair or impede" their ability to protect their interests, further described below. *See Federal Rule of Civil Procedure 24(a)(2).*

15.     DNREC's filing of its "friendly complaint" and proposed consent decree in the state court is meant to obtain a final judgment on Mountaire's responsibilities resulting from its contamination of Plaintiff-Intervenors' properties, drinking water and nearby surface waters and to release Mountaire from liability. Through these efforts, DNREC gives Mountaire a "sweetheart" deal while at the same time seeking to terminate Plaintiff-Intervenors rights to participate in either the federal or state proceeding.

16.     Plaintiff-Intervenors are the victims of Mountaire's environmental damage.  They are the ones being exposed to Mountaire's pollution. *See* Affidavits of Gary Cuppels at Exhibit F, Christina Caliguire at Exhibit G, Ronald Tolson at Exhibit H and Patricia Tolson at Exhibit I. DNREC was established to protect citizens from environmental damage and polluters, not to make deals behind closed doors.   Fairness and justice demand transparency and that Plaintiff-Intervenors be heard.

17.     DNREC has entered an agreement with Mountaire that is wholly inadequate to solve the contamination with which Plaintiff-Intervenors must live every day while

6

at the same time trying to maneuver legal proceedings to deprive Plaintiff-Intervenors of any input with DNREC or either court. Plaintiff-Intervenors have attached letters and reports from four experts with a detailed listing of the many inadequacies of the proposed consent decree. Among the inadequacies of the Consent Decree are:

o         no specifics on the type, size and design of the wastewater treatment plant and spray irrigation system upgrades and practices required of Mountaire by DNREC and, therefore, no basis to confirm that Mountaire will not continue to contaminate the groundwater and plaintiffs' drinking water wells, *see generally* Exhibit J (June 27, 2018 letter from Kenneth Norcross), and Exhibit K (June 27, 2018 letter from Dane Bauer);

o         the "Residential Area" depicted in Exhibit F of the consent decree that will be provided an "alternative water supply" includes only a small fraction of the area in which drinking water wells are presently affected and likely will be affected by Mountaire's spray irrigation and sludge disposal activities and there are no requirements for Mountaire to test other drinking water wells, including the wells of a large number of Plaintiff-Intervenors (*see e.g.* Exhibits G, H and I) to determine if its contamination has affected or will affect them, *see* Exhibit L (June 27, 2018 letter from Harvey Cohen) at pp. 5-6;

o         the "Mitigation Measures" described in Exhibit H of the consent decree do not require Mountaire to meet the drinking water standard for nitrate at its spray fields or in offsite locations; they only require Mountaire to demonstrate a 2 to 1 offset for excess total nitrogen discharged since July 2017 and there is no requirement for Mountaire to remediate or offset the excess total nitrogen it has discharged since it acquired the facilities in 2000 and that has now traveled thousands of feet from the spray fields and sludge disposal areas, *see* Exhibit L at pp. 2-5;

o      the "Mitigaton Measures" described in Exhibit H limit Mountaire's extraction of contaminated groundwater to the amount needed for processing chickens rather than the amount needed to prevent offsite drinking water well contamination, *see* Exhibit K at p. 2 (¶5)  and Exhibit L at pp. 4-5;

o      there is no requirement to reduce or remediate nitrate discharges to Swan Creek or Indian River even though the Delaware Center for the Inland Bays states that Mountaire in the major contributor of nitrates to those water bodies and is preventing them from meeting nitrogen budgets set by DNREC and approved by the United States Environmental Protection Agency ("EPA"), *see* Exhibit K at p. 2 (¶5)  and Exhibit M (March 19, 2018 Findings of the Mountaire Pollution Committee, Delaware Center for the Inland Bays) at p. 5;

o      the consent decree's failure to require more stringent sludge disposal practices by Mountaire even though the groundwater downgradient of the sludge fields and forests has been significantly degraded by Mountaire/s current sludge disposal practices, *see generally* Exhibit N. (June 27, 2018 letter from Dr. Greg Evanylo); and

o      Mountaire's public statement that improvement of its wastewater facilities to comply with the consent decree will cost only $60 million (after stating it would cost $35 million before Plaintiff-Intervenors filed their Notice of Intent to Sue Mountaire) while experienced wastewater treatment, spray irrigation and water supply experts estimate that the actual capital and 20-year operational costs to bring Mountaire's facilities into compliance, remediate contaminated groundwater and provide alternative water supplies for Plaintiff-Intervenors will cost at least $162.5-214 million depending on the number of properties requiring an alternative water supply due to  Mountaire's groundwater contamination (*see* Attachment to Exhibit J at pp. 1, 16 and Attachment to Exhibit K at pp.  2, 15).

8

18.     Moreover, DNREC's proposed consent decree seeks to absolve Mountaire of all liability, past and on-going.  In paragraph 61, DNREC gives Mountaire a sweeping release for all past environmental liability and all future liability until its system upgrade is completed.   In paragraph 46, DNREC agrees to forgive Mountaire for violations of its consent decree obligation to implement interim or long-term measures if Mountaire pays a $1000 per day stipulated penalties.  Plaintiff-Intervenors estimate that solving the problems Mountaire has created will cost $150 million or more.   Stipulated penalties of $1000 is hardly an inducement for compliance, particularly when Mountaire's general release extends until it completes upgrade. Moreover, the $600,000 civil penalty assessed in paragraph 39 of the consent decree of $600,000 is hardly even a "slap on the wrist" for a company that has gross revenues of more than $2 billion annually. And in paragraph 36 DNREC even proposes to reduce that penalty to $420,000 if Mountaire provides an "Environmentally Beneficial Offset" in the form of public water or deeper wells for a limited number of drinking water wells that Mountaire has contaminated with nitrates.

19.     DNREC's proposed consent decree also sets a very limited and subjective liability standard for Mountaire to meet during the period that the consent decree is in force.  Paragraph 62 of the consent decree states that Mountaire must "undertake all practical and reasonable measures to operate the [wastewater treatment facilities] in a manner that achieves results that approach full compliance with the Spray Permit."   By not requiring Mountaire to comply with the permit, DNREC violates the Clean Water Act and effectively modifies the permit without following any of the state public process procedures.   Moreover, how is it determined whether Mountaire's efforts are "practical and reasonable measures" and that it has achieved "results that approach full compliance?"  The proposed Consent Decree provides no criteria.

20.     DNREC's history of lax enforcement of significant violations and long-term, ongoing noncompliance by Mountaire with its wastewater discharge permits has been noted by EPA and the Delaware Center for the Inland Bays. *See* Exhibit M at pp. 9-10. EPA found that DNREC did not adequately address noncompliance in a timely and appropriate manner and did not appropriately escalate enforcement responses to address significant violations and long-term, ongoing noncompliance. Id.   While all of the reasons for DNREC's lax enforcement of Mountaire's "history of chronic permit violations that has resulted in significant pollution of ground and surface waters afforded the state's highest level of protections" *id.* at p. 10. are unclear, the recent findings of these independent bodies provide no assurance that Mountaire's "sweetheart deal" with DNREC is sufficient and that it will be enforced in a timely and appropriate manner.

## BACKGROUND

21.     Mountaire acquired the Millsboro facilities in May 2000, including wastewater treatment and spray irrigation facilities constructed in the 1970s and earlier. It assumed operational responsibility for the facilities on or about May 15, 2000.  Shortly after acquisition, it filed groundwater monitoring well documents with DNREC and EPA showing that the groundwater in and around the processing plant and spray irrigation fields was contaminated with nitrates at levels greatly exceeding the Federal and Delaware Drinking Water standard of 10 milligrams per liter (10 mg/l) nitrate as nitrogen that is also expressed as 10 parts per million ("ppm") nitrate as nitrogen.

22.     Notwithstanding that Mountaire knew that groundwater nitrate levels near the facility were already elevated and its antiquated wastewater facilities were incapable of treating its wastewater sufficiently, Mountaire rapidly increased poultry production and waste generation at

the plant without adequately expanding or upgrading its wastewater and sludge treatment capacity to reduce the concentrations of nitrate-causing nitrogen wastewater and liquid sludge before disposing of it on lands near Plaintiff-Intervenors' homes and private wells.

23.     The water-bearing formations under the Mountaire plant and the surrounding residential water supply wells consist of the Columbia surficial aquifer and the deeper Upper Chesapeake aquifer, which supply the drinking water for human consumption both for Mountaire's onsite wells and surrounding residential wells. Private wells in this area are generally 50 to 100 feet deep and have adequate yield to supply the needs of a household. The soil above the groundwater is generally sandy and liquids applied to the surface readily seep into the groundwater.

24.     Nitrate in drinking water is odorless and colorless.  Ingestion of nitrates interferes with the oxygen-carrying capacity of blood, potentially resulting in cyanosis and at higher levels, asphyxia.  Chronic exposure to nitrates is also known to cause various health problems, as described in detail below.

### EPA Orders Mountaire to Remediate the Groundwater in 2003

25.     2002, EPA found that Mountaire had violated the Safe Drinking Water Act, 42 USC § 300i(a)(1), because its poultry operations had impacted the nitrate levels in the ground water used as a source of drinking water.  EPA noted that the Delaware Department of Health and Social Services had tested eleven nearby residential wells, with ten of the eleven testing above the 10 ppm drinking water standard and with levels ranging from 12 ppm to 25.6 ppm.  EPA found that drinking water at those levels may present an imminent and substantial endangerment to public health.

26.     Mountaire entered an administrative consent order ("Order") with EPA in 2003, agreeing among other things to provide emergency alternative drinking water to residences whose wells had been contaminated and to remediate the groundwater at the facility and its spray fields to reduce the nitrate to levels below the drinking water standard. *See* Exhibit O (U.S. EPA Order on Consent) at p. 6, ¶38.  Since 2003, Mountaire has continually violated the Order by failing to reduce the concentrations of nitrates in the groundwater to meet the drinking water standard.  Its operations have continued to degrade and contaminate the groundwater with ever-increasing concentrations of nitrates and with expanding areas of degradation.

27.     Despite knowledge of monitoring well data indicating nitrate levels exceeding 10 ppm in groundwater leaving Mountaire's property in 2002 and thereafter, Mountaire failed to test other downgradient private wells or warn residents in the path of the nitrate plume.  Mountaire failed to warn Plaintiff-Intervenors even though there were published reports by the Delaware Geological Society indicating that groundwater would flow 400 feet or more per year in that area.

### Mountaire Builds a Rendering Plant

28.     In 2009, Mountaire applied to DNREC for a permit under Delaware's Coastal Zone Act to construct and operate a "resource recovery plant" at its Millsboro plant that would process and treat wastewater from the recovery 3544 tons of blood, feathers and offal from its Millsboro and Selbyville processing plants, farms and hatcheries.  Mountaire told DNREC this new rendering plant would generate an additional 100,000 pounds of total nitrogen per year in its wastewater but that it would upgrade its existing wastewater treatment plant to decrease the Total Nitrogen being sprayed on fields near Plaintiff-Intervenors' properties.

29.     Although DNREC's approval of Mountaire's new rendering plant in November 2010 was contingent on Mountaire's representation that it would upgrade its wastewater facilities

to offset the additional nitrogen loading, Mountaire completed construction and started operation of the rendering plant in 2011 but did not complete a limited upgrade of the treatment plant's nitrogen treatment units until 2013. *See* Attachment to Exhibit J at p. 5, ¶6.

30.     On information and belief, Mountaire's new "resource recovery plant" saves Mountaire millions of dollars per year in shipping and rendering costs while significantly increasing the amount of nitrogen-laden wastewater and sludge disposed on lands near Plaintiff-Intervenors' properties.

### *2010 DNREC Notice of Violations*

31.     Ironically, as DNREC was approving Mountaire's new rendering plant and the Delaware Economic Development Office was providing Mountaire with a $757,500 grant to build the rendering plant that would increase the amount of nitrate-forming nitrogen in its wastewater, Mountaire was cited by DNREC in a Non-Compliance Notice finding the company in violation of DNREC's regulations and its spray irrigation discharge permit for exceeding the drinking water standard for nitrates in numerous Mountaire monitoring wells downgradient of Mountaire's wastewater spray fields. *See* Exhibit P (Sept 7, 2010 Non-Compliance Notification) at p. 3. DNREC cited Mountaire for excessive nitrogen loading to the spray fields and ordered Mountaire to conduct a survey of new homes with wells constructed near and downgradient of the spray fields, test such wells for nitrates and other contaminants, and provide bottled water to any residents with well water in excess of the 10 ppm drinking water standard for nitrates. There is no indication that Mountaire tested any residential wells or provided bottled water to any residents.

32.     In response, Mountaire proposed to install enhanced nitrogen treatment to reduce the pollutant levels in its wastewater. Mountaire indicated that with this new equipment, it would

13

achieve a wastewater discharge with maximum concentrations of Total Nitrogen (from which nitrates derive) to 15.6 mg/l.

33.    The treatment became operational in 2013 and, according to Mountaire's reports filed with DNREC, resulted in some temporary improvement but by early 2015, Total Nitrogen in Mountaire's wastewater was skyrocketing.  In 2017, the concentration of Total Nitrogen was as high as 641 mg/l.  Day and night, Mountaire continued to spray this grossly contaminated wastewater on fields near Plaintiff-Intervenors' residences.

### *Mountaire's 2017 Certification*

34.    Despite its inadequate and failing wastewater treatment facilities, Mountaire once again applied to DNREC in May 2017 to expand its chicken processing production at the Millsboro plant by adding a third shift that would increase the volume of wastewater and Total Nitrogen disposed on the spray fields near Plaintiff-Intervenors' homes by 18%. *See* Exhibit Q (May 18, 2017 Application for a Coastal Zone Permit) at p. 5.  In its Coastal Zone Act permit application that was certified by its President and Chief Executive Officer as true and complete under penalty of perjury, Mountaire stated that if there were a major technical malfunction or human error causing a change in its wastewater discharge that continued and could not be contained by the storage at the plant, "live haul operations will be interrupted and the processing plant (will be) shut down." *Id.* at p. 22, ¶6.39; *id.* at p. 3 (President's Certification).

### *2017 Notice of DNREC's Violations*

35.    Even though Mountaire promised to control its wastewater discharge or shut down operations just seven months earlier, on November 2, 2017 DNREC issued a Notice of Violation ("NOV") to Mountaire for polluting the groundwater and more than 100 other violations of Mountaire's Wastewater Spray Irrigation Permit. *See* Exhibit R (Nov. 2, 2017 Notice of Violation

W-17-GWD-13).  DNREC noted in the NOV that Mountaire had committed to reducing Total Nitrogen in its wastewater to 15.6 mg/l, but instead was disposing of wastewater with Total Nitrogen as high as 641 mg/l. *Id.* at p. 5.

36.     DNREC found that Mountaire was also violating other permit limits.  For example, Mountaire was obligated to maintain "fecal coliform" below a limit of 200 colonies/100 ml, but had levels as high as 1,100,000 colonies/100 ml. *Id.* at p. 9. Mountaire also violated its permit limits for Biological Oxygen Demand, Total Suspended Solids and Chlorine. *Id.* at pp. 6-8. Mountaire was applying wastewater with these extremely high levels of pollutants on the spray fields near Plaintiff-Intervenors' residences.

37.     In addition to the high pollutant levels contained in Mountaire's wastewater that was being sprayed on fields, DNREC stated in the 2017 NOV that Mountaire exceeded the amount of nitrogen its permit allowed to be applied to each acre on 11 of the 13 fields it was authorized to use. *Id.* at pp. 5-6.   By August 2017, Mountaire had already exceeded the permitted total amount of Nitrogen allowed for each spray field for the year. *Id.* at p. 6.  Just in the month of August, Mountaire had loaded six of the fields in excess of annual limits. *Id.*

38.     DNREC's 2017 violation notice found that Mountaire had regularly exceeded its permit design value for Total Nitrogen in the effluent since 2015. *Id.* p. 4

39.     Notwithstanding Mountaire's long-term non-compliance, DNREC gave Mountaire an additional 90-day opportunity to bring its treatment system into compliance. DNREC states in the 2017 NOV that Mountaire did not improve the treatment system so as to reduce the level of contamination or even submit a plan for compliance. *Id.* at p. 2.

40.     Mountaire's spray irrigation permit mandates that "Operation of the wastewater treatment facility and spray irrigation system shall not cause the quality of Delaware's

15

groundwater resources in be in violation of the Federal or State Drinking Water Standards. . . ."
*See* Exhibit S (Spray Irrigation Operations Permit DEN Number 359191-04) at p. 20, § III.A.1.

41.     By ramping up its production of processed chickens without providing for treatment of the increased quantities and strength of wastewater the facility generated and then, even after adding some enhanced treatment, generating wastewater that egregiously violates the limits for multiple pollutants, including Total Nitrogen, Mountaire's operations have degraded Plaintiff-Intervenors' groundwater and drinking water, causing Plaintiff-Intervenors to suffer multiple health issues and reduced property values.

42.     Mountaire has flagrantly disregarded its permit obligations as its operations have polluted and continue to pollute the groundwater well beyond the drinking water standard and safe levels for nitrate. Mountaire knew from the year 2000 when it acquired the facility – and was reminded by EPA in 2003, DNREC in 2010, and DNREC again in 2017 – that its plant's operations were causing dangerously high levels of nitrates in the groundwater.

43.     DNREC has found that Mountaire's failure to keep its wastewater effluent sprayed on its spray fields to within the Effluent Limits (for Total Nitrogen) specified in its spray irrigation permit is "causing an imminent and substantial endangerment to human health and the environment." *See* Exhibit T (Verified Complaint filed in U.S. District Court for the District of Delaware on June 4, 2018 -- Case 1:18-cv-00838-UNA) at p. 5, ¶16

44.     Mountaire's claimed "upset" of the wastewater treatment plant in 2017 was the predictable and inevitable result of a treatment plant that was managed incompetently for many years and allowed sludge to build up in the treatment units for at least four years. *See* Exhibit C at pp. 1, 10-11. The "upset" was foreseeable to Mountaire management if they had acted responsibly and cared about the performance of the plant. *Id.* at p. 1.

16

45.     On information and belief, Mountaire continues to violate its Spray Irrigation Permit and overload the soil and groundwater near Plaintiff-Intervenors' properties and wells with excessive nitrogen and other harmful contaminants. *See* Attachment to Exhibit J at pp. 14-15. According to Kenneth Norcross, a wastewater treatment and engineering expert with more than 35 years' experience designing, operating and troubleshooting over 100 industrial and poultry processing plants, poultry processing wastewater such as Mountaire's is not only contaminated with nitrogen compounds but also can contain fecal coliform, streptococcus, salmonella, enteric parasites, pathogenic viruses, various minerals and metals (including arsenic), antibiotics, hormones and pesticides. *Id.* at pp. 2-3. Mr. Norcross concludes that Mountaire's treatment facilities include antiquated technology and are inadequate to treat and store the volume and strength of wastewater generated by Mountaire's chicken processing operations. *Id.* at p. 1, ¶¶ 3, 7. These treatment facilities will require substantial upgrading and expansion to provide safe wastewater suitable for spray irrigation disposal. *Id.* at pp. 1, 15-16.

46.     At a public meeting in January 2018 and in other statements to the media, Mountaire representatives have stated that its wastewater treatment plant failed due to human error and that numerous employees had been fired. DNREC also acknowledges that Mountaire continues to exceed its permit limits for Total Nitrogen being applied to its spray irrigation fields that are leaching high levels of nitrates to the groundwater that serves as Plaintiff-Intervenors' drinking water. *See* Complaint filed in the Superior Court of the State of Delaware on June 4, 2018 in Case No. S18M-06-002-RFS at pp. 6-7.

47.     On information and belief, Mountaire's antiquated and inadequate wastewater treatment facilities continue to be grossly out of compliance due to technical malfunctions and the noncompliant discharge cannot be contained by the plant's wastewater effluent storage. *See*

17

Attachment to Exhibit J at pp. 14-15. Despite the continuing major technical malfunctions and admitted human errors associated with its wastewater treatment plant and its discharges that cannot be contained by its inadequate storage, Mountaire has not interrupted live haul operations or shut down its processing plant as it pledged to DNREC it would do in May 2017.

### *Mountaire's Damaging Practices*

48.    In addition to spraying inadequately treated, highly contaminated wastewater, Mountaire engages in practices that inevitably damage the groundwater.  Mountaire sprays when conditions are unsuitable, include during ponding, frozen ground, seasonal high water table conditions, and following harvesting or when crops are dormant. *See* Attachment to Exhibit K at pp. 1 (¶ 3), 9-12.  EPA warned DNREC as early as 2000 that these practices by Mountaire were not protective of the adjacent surface waters. See Exhibit U (Dec. 22, 2000 letter from Rebecca Hammer to Kevin Donnelly). According to Dane Bauer, an expert in wastewater spray irrigation with over 40 years' experience in regulating, permitting and compliance of spray irrigation of poultry wastewater for both government and the poultry industry, Mountaire's wastewater spray irrigation practices fall far short of the industry standard and are contributing to excessive nitrates in the groundwater. *See* Attachment to Exhibit K. at pp. 9-11.

49.    Mountaire also has inadequate capacity to store its treated wastewater before sending it to the spray fields. *Id.*  On days that are unsuitable for spray irrigation, Mountaire should store its wastewater and wait for suitable conditions to return.  It has less than ten days' capacity for treated wastewater storage.  Industry standards would require at least 60 to 90 days of storage, without which Mountaire is spraying when it should not be and thereby degrading the groundwater in the vicinity of the spray fields. *Id.* These actions have resulted in injury to

Plaintiff-Intervenors, the groundwater and surface water as well as conditions that present serious, on-going public health and environmental risks.

*Mountaire's Sludge Disposal*

50.     Mountaire also generates and stores large quantities of nitrogen-laden liquid sludges in its wastewater treatment plant.   Millions of gallons of these sludges have been transported by truck to fields and forests owned by Mountaire and others where they are spread, injected, and sprayed onto the land.   In recent years, two million gallons or more of liquid sludges were disposed on five different sites.

51.     DNREC cited Mountaire in November 2017 for a series of sludge practices that have caused and will continue to cause nitrate contamination of groundwater, including excessive application of sludge to cropland, minimal crop growth and failure to plant crops in accordance with permit timelines.  *See* Exhibit R at pp. 16-19

52.     According to Dr. Gregory Evanylo, a professor and expert with more than 30 years' experience in the assessment of land application of agricultural and other sludges, these and other sludge disposal practices result in reduced plant uptake of nitrogen and increased groundwater contamination by nitrates. *See* Attachment to Exhibit N.

53.     Dr. Evanylo concludes that "[t]he sludge application violations cited in DNREC's November 2, 2017 Notice of Violation (NOV) issued to Mountaire are consistent with mismanagement practices that can increase groundwater nitrate concentrations to excessive levels" and  "[b]ased on the increase in groundwater nitrate in monitoring wells hydrologically downgradient from at least five sludge application field and forest sites used by Mountaire, the highly leachable soil onto which the sludge was applied, and the application mismanagement exemplified in the 2017 DNREC NOV, it is likely that the increase in groundwater monitoring

19

well nitrate concentrations is a result of excessive application of sludge by Mountaire." *Id.* at p. 1. Moreover, Mountaire has insufficient storage capacity for stabilized sludge accumulation at its treatment plant given that it should not be applying sludge to crop fields during at least four months during the year. *See* Attachment to Exhibit J at p. 16.

54.     On information and belief, Mountaire's nitrogen balance calculations for its sludge disposal fields are flawed because the crop yields assumed in its calculations in actuality have been significantly lower. Thus, the nitrogen uptake by the crops assumed by Mountaire has been grossly overestimated in reports to DNREC with the result that much more nitrate-forming nitrogen has been released to the groundwater. DNREC recently found that Mountaire disposed of approximately 2 million gallons of "return activated sludge" in 2017 without submitting a cropping plan or nutrient calculations as required by Mountaire's sludge permits. *See* Exhibit R at p. 16. On information and belief, this "return activated sludge" was not stabilized as required by Mountaire's permits and resulted in the disposal of untreated sludge that was malodorous, contained pathogens and attracted disease-transmitting insects.

55.     In its June 4, 2018 Complaint, DNREC states that the amount of sludge disposed by Mountaire in 2017 was in excess of agronomic rates, thereby contributing to nitrate contamination in groundwater, causing an imminent and substantial endangerment to human health and the environment. Exhibit T at pp. 4 (¶ 13) and 5 (¶16). The groundwater downgradient of Mountaire's sludge disposal fields and forests has been degraded by nitrates that are now contributing and will contribute in the future to Plaintiff-Intervenors' well contamination. *See* Attachment to Exhibit L at p. 1.

*Mountaire's Lagoons are Leaking*

56.     Mountaire facility includes two large (9 million gallons each) anaerobic wastewater treatment lagoons and one 14.2 million gallon treated wastewater lagoon, constructed many years ago adjacent to Swan Creek.

57.     Lagoons of this age are prone to leakage and exceedingly high nitrate concentrations in monitoring wells immediately downgradient of the lagoons indicate the lagoons are leaking. *See* Attachment to Exhibit K at p. 5.

58.     DNREC has recently stated that Mountaire's anaerobic lagoons are leaking and causing nitrate contamination in the groundwater in the vicinity of the Mountaire plant. Exhibit T at p. 5, ¶17.

59.     On information and belief, Mountaire's leaking lagoons are contaminating groundwater and surface waters that Plaintiff-Intervenors use for recreation and a food supply.

*Mountaire's Groundwater Contamination has Spread since 2003*

60.     Mountaire has not only failed to remediate the groundwater as the EPA ordered it to do in 2003, but its operations continue to degrade and contaminate the groundwater. DNREC's 2017 NOV states that Mountaire's "[g]roundwater monitoring wells have consistently exceeded the drinking water standard of 10 [ppm] for [nitrate] and have shown no improvement since Mountaire acquired ownership of the facility in May of 2000." Exhibit R at p. 10.

61.     The extent and severity of groundwater contamination has grown and continues to grow. Exhibit L at Figure 2 displays wells that have been tested for nitrates in the vicinity of Mountaire's waste disposal facilities, many of which exceed the 10 ppm drinking water standard and most of which exceed the safe level according to public health experts who have studied the chronic effects of nitrates in drinking water. Numerous Mountaire groundwater monitoring wells,

located between several of Mountaire's spray fields and Plaintiff-Intervenors' wells, show increasing nitrate levels since Mountaire acquired the processing plant and began operating the wastewater treatment plant spray facilities in 2000. See Attachment to Exhibit L at pp. 9-10 and Fig. 4.

62.     Many of the Plaintiff-Intervenors recently have had their wells tested and found that nitrate levels exceed the 5 ppm threshold for health effects, thus presenting hazards to their health. According to Dr. Harvey Cohen, a hydrogeologist with more than 20 years' experience evaluating the groundwater flow and the transport of contaminants in groundwater, "Mountaire has contaminated, and continues to contaminate the shallow, unconfined Columbia aquifer with nitrate in excess of drinking water standards, as a result of spray irrigation and sludge disposal practices" and "[t]he groundwater contaminated by Mountaire has impacted, and continues to threaten domestic water supply wells downgradient of the spray irrigation and sludge disposal fields." Exhibit L at p. 1.

### Chicken Houses Contributing Nitrates are Owned and Controlled by Mountaire

63.     Mountaire formerly owned and operated five chicken houses on its Maryland Camp Road property.

64.     They housed laying hens. Operation of these chicken houses have contributed to the excessive nitrate levels measured in Mountaire's spray fields and downgradient wells used by Plaintiff-Intervenors.

65.     On information and belief, Mountaire also owns, finances and/or contracts with chicken growers whose waste practices likely have contributed to contamination of Plaintiff-Intervenors' wells. On information and belief, Mountaire owns the chickens grown in the houses, supplies the feed and controls how the chicken houses are designed, constructed and operated.

***Health Effects are Proximately Caused by Mountaire***

66.     Human consumption of water containing levels of nitrate exceeding 5 ppm significantly enhances the risk of potentially severe health problems, including but not limited to methemoglobinemia ("blue baby syndrome," a fatal condition that affects infants), arthritis, birth defects, bladder cancer, Type 1 diabetes, gastric cancer, genotoxicity, high blood pressure, brain tumors, colorectal cancer, non-Hodgkin's lymphoma, ovarian cancer, prostate cancer, respiratory infections, thyroid issues, and autoimmune system dysfunction. See Exhibit V ("Nitrate: Environmental and Human Health Implications" by Dr. Catherine Zeman). Dr. Zeman is a public health expert specializing in the health effects of nitrates on humans. She has been a professor of Environmental Health at the University of Northern Iowa for 18 years and has more than 25 years of experience in the environmental science and health fields, including authoring peer-reviewed journal articles addressing the negative impacts of nitrates on public health.

67.     Plaintiff-Intervenors have suffered these ailments as a proximate result of ingesting groundwater contaminated by Mountaire. Plaintiff-Intervenors live in fear of further illnesses developing from the years they were not told about the elevated nitrates. They live with the inconvenience of bottled water or expensive home treatment systems because their well water is no longer potable. Their properties have decreased in value and may be unsaleable as a result of Mountaire's reckless disregard of the damage it was and is doing.

68.     As early as the 2003 EPA Order, Mountaire was told, and agreed by signing the Order, that "high levels of nitrate in water can lead to 'blue baby syndrome' that can be fatal" and that "high levels of nitrate have been linked to gastric problems and hypertension." Exhibit O at p. 3, ¶19. In spite of these warnings, Mountaire has continued to spray more than 10 billion gallons of wastewater effluent and dispose of millions of gallons of liquid sludge containing high levels of

23

nitrate-forming nitrogen and other contaminants on lands adjacent to Plaintiff-Intervenors' homes and drinking water wells.

### *Swan Creek and Indian River are Being Polluted by Mountaire*

69.     DNREC has monitored water quality of Indian River near Mountaire since at least 2000. The average total nitrogen concentration in the river is more than twice the healthy limit. Pollution in this protected river is increasing and Mountaire is a significant contributor. Exhibit M at p. 5.

70.     For the year 2009, DNREC found that Mountaire exceeded its permit limit or nitrogen application by 78,465 pounds or an average of 215 pounds per day. *Id.* at p. 7. By comparison, the total nitrogen that DNREC has determined can enter Swan Creek from its entire watershed while still allowing healthy conditions in the creek is 65 pounds per day. The over-application of nitrogen from Mountaire alone was three times the assimilative capacity of Swan Creek.

71.     Excessive levels of nitrates discharged to the Indian River and Swan Creek cause an overabundance of algae and seaweeds, murky water, and low oxygen levels that result in fish kills and lower fish populations.

72.     Mountaire's years of applying billions of gallons of wastewater to lands with a shallow groundwater table increased the water table elevations resulting in higher rates of groundwater migration. *See* Attachment to Exhibit K at p. 5. This migration is a conduit for groundwater to flow to surface streams and the Indian River. *Id.* The independent, federally-funded Delaware Center for the Inland Bays concluded in a March 2018 investigatory report that nitrate groundwater contamination from Mountaire's facilities is a significant contributor to the degradation of Indian River and Swan Creek. Exhibit M at p. 5.

### *Mountaire's Air Pollution and Odors Significantly Impact Plaintiffs*

73.     Mountaire's antiquated wastewater treatment facilities generate huge quantities of toxic and malodorous gases that are emitted to the atmosphere and travel to Plaintiffs' homes and properties.  According to an EPA screening model used by John Purdum, a scientist who has been performing air quality modeling for more than 35 years, results from an EPA screening model indicate that hydrogen sulfide, a poisonous gas that smells like rotten eggs, reaches most if not all of the Plaintiffs' properties at levels that exceed the Delaware standard of 0.03 ppm. Exhibit W (June 12, 2018 Air Quality Screening Modeling Analysis of Hydrogen Sulfide and Ammonia Emissions from Mountaire Farms), p. 1 and Figs. 2 and 3.

74.     The U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") has concluded that exposure to low levels of hydrogen sulfide can cause respiratory and neurological effects including eye, nose and throat irritation, difficulty breathing in people with asthma, headaches, poor memory, tiredness and balance problems.  Plaintiffs suffer these and other effects from Mountaire's air pollution.

75.     Mountaire's spray irrigation operations and its disposal of sludge by spraying and surface application also release massive amounts of malodorous ammonia and other chemicals into the air which are transported by wind and dispersion to nearby properties.   The EPA screening model results in concentrations that exceed the acute duration (1.7 ppm) and chronic duration (0.1 ppm) Minimal Risk Levels ("MRLs") established by the ATSDR. *Id.* at p. 1 and Figs. 4 and 5.  ATSDR based its MRLs for ammonia on studies showing eye, nose and throat irritation from exposure to ammonia.  Plaintiffs suffer these and other effects from Mountaire's air pollution.

25

76.     DNREC's regulations require that no person shall cause or allow the emission of an odorous air contaminant that significantly affects the citizens of the State outside the boundaries of the air contaminant source. *See 7 Del. Admin C.* § 1119.

77.     Levels of hydrogen sulfide and ammonia released into the air by Mountaire's wastewater facilities significantly affect Plaintiffs' health, residences and properties and violate DNREC's odor regulation and yet the consent decree contains no directive for Mountaire to address these environmental and public health issues.

## COUNT ONE

### *VIOLATION OF RCRA*

78.     Plaintiff-Intervenors reallege and incorporate by reference all of the foregoing allegations.

79.     Under 42 U.S.C. § 6972(a)(1)(B), citizens are authorized to bring suit against any person who is the "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

80.     Mountaire is a generator, treater and transporter of solid waste and the operator of a treatment, storage, and disposal facility that is contributing to the past and present storage or disposal of solid wastes, namely liquid and solid waste from its poultry processing facility. Mountaire is presenting an imminent and substantial endangerment to health and the environment, in violation of 42 U.S.C. § 6972(a)(1)(B).

26

## COUNT TWO

### *Open Dumping*

81.     Plaintiff-Intervenors reallege and incorporate by reference all of the foregoing allegations.

82.     Mountaire's improper disposal practices described above constitute "open dumping" in violation of RCRA. 42 U.S.C. § 6945(a) prohibits the operation of "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste." "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste . . . into or on any land or water" 42 U.S.C. § 6903(3).

83.     EPA has promulgated criteria under RCRA § 6907(a)(3) defining solid waste management practices that constitute open dumping. *See* 42 U.S.C. § 6944(a); 40 C.F.R. Parts 257 and 258. These regulations prohibit the contamination of any underground drinking water source beyond the solid waste boundary of a disposal site. 40 C.F.R. § 257.3-4(a).

## COUNT THREE

### *Violation of Clean Water Act*

84.     Plaintiff-Intervenors reallege and incorporate by reference all of the foregoing allegations.

85.     Section 301 of the Clean Water Act, 33 U.S.C. §1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States unless such discharge is authorized pursuant to a National Pollutant Discharge Elimination System permit issued pursuant to Section 402 of the Act. The discharges from the leaking lagoons, spray irrigation fields, sludge disposal fields and forests and other areas contaminate the groundwater and the groundwater, in turn, is hydrologically connected to and is a conduit to Swan Creek and Indian River. *See, Sierra*

*Club v. Virginia Electric Power Company dba Dominion Virginia Power*, Opinion issued March 23, 2017 Civ. Action No. 2:15-CV-112 (E.D.V.A.) The types of discharges that have occurred, are occurring and that are likely to continue to occur are not permitted under federal or state law.

86.     Mountaire is continuing, and will continue, to illegally discharge pollutants into waters of the United States in violation of the Clean Water Act. All specific discharges discovered subsequent to the sending of this notice, of similar type and nature, whether occurring prior or subsequent to this notice, shall be included in the action in this case without the need for further notice under 33 U.S.C. §1365(b).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff-Intervenors, on behalf of themselves and all others similarly situated, respectfully request that the Court provide Plaintiff-Intervenors with the following relief:

A.     Allow the Plaintiff-Intervenors to participate as parties in the present case;

B.     Declare that DNREC, as a result of its refusal to hear from Plaintiff-Intervenors, its deliberate ignorance of the magnitude of the environmental contamination caused by Mountaire, its closed-door agreement giving Mountaire a sweeping retrospective and prospective release from liability and a virtually unenforceable and wholly inadequate proposed consent decree is not diligently prosecuting Mountaire's violations of RCRA and the CWA;

C.     Find that Mountaire has violated RCRA and the CWA and impose an appropriate penalty and remedy to protect Plaintiff-Intervenors and the environment;

D.     Order Mountaire to: i) provide Plaintiff-Intervenors with safe potable water, to flow from their faucets, at no cost to them; ii) upgrade and operate Mountaire's wastewater treatment, irrigation, and sludge disposal facilities in accord with its permits, laws, regulations and

industry standards; and iii) remediate contaminated groundwater to prevent further negative water quality impacts on Swan Creek and Indian River and its tributaries;

    E.    Award the costs and expenses of this action, including all attorneys' fees; and

    F.    For all other further and general relief.

**BAIRD MANDALAS BROCKSTEDT, LLC**

*/s/ Chase T. Brockstedt*
Chase T. Brockstedt, Esq. (Bar No. #3815)
Stephen A. Spence, Esq. (Bar No. #5392)
1413 Savannah Road, Suite 1
Lewes, Delaware 19958
(302) 645-2262
Attorneys for Plaintiff-Intervenors
chase@bmbde.com

OF COUNSEL:
Philip C. Federico, Esq. (*pending admission pro hac vice*)
Brent Ceryes, Esq. (*pending admission pro hac vice*)
SCHOCHOR, FEDERICO AND STATON, P.A.
1211 St. Paul Street
Baltimore, Maryland 21202
Dated: June 29, 2018    (410) 234-1000