# Exhibit A



March 27, 2018

Ronald M. Cameron
Chairman
Mountaire Corporation
1901 Napa Valley Dr.
Little Rock, AR 72212

Paul Downes
President and CEO
Mountaire Farms Inc.
PO Box 1320
Millsboro, DE 19966

Mike W. Tirrell
Executive Vice President of Processing Operations
Mountaire Farms Inc./Mountaire Farms of Delaware, Inc.
PO Box 1320
Millsboro, DE 19966

**NOTICE OF INTENT TO SUE PURSUANT TO RESOURCE CONSERVATION
AND RECOVERY ACT, 42 U.S.C. § 6972(b)(2)(A)**

Dear Mr. Cameron, Mr. Downes, and Mr. Tirrell:

Pursuant to the 1976 Amendments to the Solid Waste Disposal Act (hereinafter referred
to as the "Resource Conservation and Recovery Act" or "RCRA"), 42 U.S.C. § 6972(b)(2)(A),
Joan Balback, Joseph Balback, Faye Burton, Titus Burton, Carol Cordrey, Charles Cordrey,
Eleanor Cordrey, Gerald Cordrey Jr., Tillie Cordrey, Jeff Davis Sr., Jeff Davis Jr., Megan
Gallagher, Trevor Gallagher, Brittany Hayes, Colleen Hough, Michael Hough, Brannon Johnson,
Tom Johnson, Monica Johnson, Ernest Kollock, Ginger Kollock, Lisa McCabe, Eileen Mooney,
James Mooney, Damon O'Leary, Kim O'Leary, Tom O'Leary, Michael Orlen, Michelle Orlen,
Jean Phillips, Robert Phillips, Donna Reid, James Reid, Tiffany Reid, Nina Davis Rodriguez,
Frances Schuck, Bruce Sentman, Maryann Sentman, Patsy Taylor, Daniel Turpin, Patricia
Turpin, Charles Wayne, Dylan O'Leary Welsko, Junior Wise, Martha Wise, Preston Wise,
Wescenia Wise (collectively, "Community Plaintiffs") and Food & Water Watch hereby notifies
you that on or after the 90th day from the date of your receipt of this notice, the Community
Plaintiffs and Food & Water Watch intend to initiate a citizen suit in Delaware Federal District
Court against Mountaire Farms Inc., Mountaire Farms of Delaware Inc, and Mountaire
Corporation for violations at their Millsboro poultry processing plant as described below
("collectively Mountaire").

Mountaire owns and operates a poultry processing plant located on Route #24,
approximately 2.0 miles east of Millsboro, Sussex County, at or near 29005 John J. Williams

publicjustice.net        National Headquarters                                      West Coast Office
                         1620 L Street NW, Suite 630, Washington DC  20036          475 14th Street, Suite 610, Oakland, CA 94612
                         (202) 797-8600 phone • (202) 232-7203 fax                  (510) 622-8150 phone

Highway, Millsboro, DE.  The Millsboro processing plant slaughters and processes about 2 million chickens per week, operating 16 hours per day, five days a week, and produces 2.4 million gallons of waste per day.  The waste created by the processing plant includes feathers, dirt, fecal matter, blood, slaughtering wastewater, carcass parts, grit, sand, gravel, flesh, fat, grease, chiller wastewater, processing wastewater, cleanup wastewater, and sanitary waste from the employees at the plant.  Under a State of Delaware Spray Irrigation Permit Number 359191-04, Mountaire disposes of its wastewater on 928 acres of farmland permitted for spray irrigation. This plant, wastewater treatment and storage, and spray irrigation activity are what is at issue in this lawsuit as is described in the map below:



Figure 1: USGS 7.5 minute quadrangle map for Millsboro, Delaware showing the location and topography of the site and surrounding area (created 1954, Photorevised 1992)

The Community Plaintiffs live approximately 125 feet to ½ mile downgradient from the spray fields and wastewater storage at issue.  The lawsuit will allege that Mountaire has contributed and is contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid waste in such a manner that may present an imminent and substantial endangerment to health and the environment in violation of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).  The lawsuit will also allege that Mountaire is operating an "open dump" in violation of Section 4005(a) of RCRA, 42 U.S.C. § 6945(a).

By failing to comply with RCRA, Mountaire has injured or threatened to injure, and will continue to injure or threaten to injure, the health, environmental, and economic interests of the Community Plaintiffs and Food & Water Watch's members. These injuries or risks are traceable to Mountaire's violations on their property, and redressing those ongoing violations will redress the Community Plaintiffs' and Food & Water Watch's injuries or risks. The Community Plaintiffs and Food & Water Watch will seek mandatory injunctive relief requiring Mountaire to immediately cease its open dumping and abate and/or remediate the source(s) of the endangerment to health and the environment and an order from the Court requiring Mountaire to pay the attorneys and expert witness fees and costs incurred in bringing this enforcement action. This letter serves to notify you that Community Plaintiffs and Food & Water Watch intend to file suit in federal district court against Mountaire any time beginning ninety (90) days after the certified receipt of this letter if Mountaire does not remedy the RCRA violations during this period. The suit may also include common law claims for money damages and other relief.

## VIOLATIONS OF THE RESOURCE CONSERVATION AND RECOVERY ACT: IMMINENT AND SUBSTANTIAL ENDANGERMENT

Under 42 U.S.C. § 6972(a)(1)(B), citizens are authorized to bring suit against any person who is the "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." In this case, Mountaire is the generator, transporter, and owner and/or operator of a treatment, storage, and disposal facility that is contributing to the past and present storage, treatment, transportation and/or disposal of solid wastes, namely poultry processing wastewater and sanitary waste sprayed onto disposal fields as part of their Spray Irrigation Permit Number 359191-04. Mountaire's liquid wastes constitute "solid wastes" under RCRA because they are "any...discarded material, including solid, liquid, semisolid... material resulting from industrial, commercial... and agricultural operations..." 42 U.S.C. § 6903(27). Mountaire's practices in storing, treating, transporting, applying, and disposing of poultry processing wastewater and sanitary waste may, and do, present an imminent and substantial endangerment to the health of nearby residents and to the environment.

In particular, Mountaire and/or its agents have applied, currently do apply, and are reasonably likely to continue to apply poultry processing wastewater and sanitary wastes to thirteen nearby agricultural fields in amounts that exceed agronomic rates.  Delaware

3

Department of Natural Resources and Environmental Control ("DNREC") inspection reports show that Mountaire routinely applied nutrients in excess of its annual application rate of 320 lbs/acre of nitrogen, a strong indication that Mountaire has applied its wastewater in excess of agronomic rates. For example, in 2017, Mountaire exceeded its annual rate on all but two of its fields. In fact, in 2017, six of the spray fields exceeded the total application rate for the entire year in the month of August alone:

| Field | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | TOTAL |
|-------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| CB3 | 20.2 | 13.37 | 9.82 | 16.58 | 16.24 | 13.78 | Failed to Report | 413.95 | 2.44 | 506.38 |
| CB3A | 28.89 | 37.81 | 13.99 | 0 | 27.99 | 27.23 | Failed to Report | 0 | 0 | 135.91 |
| CB3B | 47.47 | 19.61 | 7.33 | 39.01 | 26.26 | 21.76 | Failed to Report | 104.75 | 355.36 | 621.55 |
| CB3C | 19.36 | 23.92 | 13.69 | 94.83 | 0 | 0 | Failed to Report | 483.21 | 202.03 | 1038.04 |
| CB3DE | 23.71 | 19.47 | 8.71 | 107.68 | 16.05 | 8.65 | Failed to Report | 344.21 | 195.11 | 723.59 |
| CB3DW | 44.24 | 22.7 | 6.15 | 0 | 41.37 | 45.26 | Failed to Report | 179.21 | 0 | 338.93 |
| WHBJ1 | 15.28 | 24.48 | 9.09 | 51.24 | 6.31 | 1.13 | Failed to Report | 24.95 | 71.80 | 204.28 |
| WHBJ2 | 40.9 | 32.79 | 12.72 | 56.07 | 17.8 | 25.61 | Failed to Report | 583 | 252.10 | 926.90 |
| WHBJ3 | 29.56 | 13.08 | 15.13 | 51.88 | 16.95 | 19.3 | Failed to Report | 344.29 | 312.46 | 802.65 |
| WHBJ4 | 21.42 | 0 | 7.36 | 18.07 | 14.86 | 14.67 | Failed to Report | 243.24 | 190.97 | 510.60 |
| WHBJ5 | 31.99 | 24.66 | 13.07 | 50.67 | 4.37 | 5.29 | Failed to Report | 268.04 | 211.51 | 609.60 |
| WHBJ6 | 47.58 | 29.88 | 0.04 | 63.18 | 11.16 | 13.14 | Failed to Report | 231.10 | 133.21 | 529.35 |
| WHBJ7 | 35.64 | 20.43 | 12.99 | 24.92 | 19.1 | 19.04 | Failed to Report | 212.35 | 186.96 | 531.43 |

Upon information and belief, this over application beyond the 320 lbs/acre limit has occurred for at least the past five years.

Additionally, DNREC inspection reports from 2015 to the present have indicated that effluent waste sprayed onto the disposal fields was above the 15.6 mg/l Total Nitrogen limit allowed in Mountaire's spray irrigation permit. For example, in 2017, the following nitrogen concentrations were:

4

| Characteristic | Date | Result | Unit |
|----------------|------|--------|------|
| Total Nitrogen | 1/4/2017 | 56.2 | mg/L |
| Total Nitrogen | 2/8/2017 | 41.86 | mg/L |
| Total Nitrogen | 3/1/2017 | 18.76 | mg/L |
| Total Nitrogen | 4/24/2017 | 76.75 | mg/L |
| Total Nitrogen | 5/25/2017 | 30.8 | mg/L |
| Total Nitrogen | 6/21/2017 | 31.47 | mg/L |
| Total Nitrogen | 7/28/2017 | 26 | mg/L |
| Total Nitrogen | 8/30/2017 | 406 | mg/L |
| Total Nitrogen | 9/14/2014 | 368 | mg/L |
| Total Nitrogen | 9/21/2017 | 356 | mg/L |
| Total Nitrogen | 9/26/2017 | 641 | mg/L |
| Total Nitrogen | 9/28/2017 | 210 | mg/L |
| Total Nitrogen | 9/29/2017 | 320 | mg/L |
| Total Nitrogen | 10/2/2017 | 172 | mg/L |
| Total Nitrogen | 10/3/2017 | 163 | mg/L |
| Total Nitrogen | 10/4/2017 | 142 | mg/L |
| Total Nitrogen | 10/5/2017 | 164 | mg/L |
| Total Nitrogen | 10/6/2017 | 184 | mg/L |
| Total Nitrogen | 10/9/2017 | 151 | mg/L |
| Total Nitrogen | 10/10/2017 | 182 | mg/L |
| Total Nitrogen | 10/9/2017 | 151 | mg/L |
| Total Nitrogen | 10/10/2017 | 182 | mg/L |
| Total Nitrogen | 10/11/2017 | 105 | mg/L |
| Total Nitrogen | 10/12/2017 | 98 | mg/L |
| Total Nitrogen | 10/13/2017 | 102 | mg/L |
| Total Nitrogen | 10/16/2017 | 98.2 | mg/L |
| Total Nitrogen | 10/17/2017 | 122 | mg/L |
| Total Nitrogen | 10/18/2017 | 136 | mg/L |
| Total Nitrogen | 10/19/2017 | 111 | mg/L |
| Total Nitrogen | 10/20/2017 | 118 | mg/L |

Applying wastewater with more nutrients than allowed by the permit is evidence that Mountaire has applied its wastewater in excess of agronomic rates. Applications in excess of what the current crop can effectively utilize causes nitrates to leach through soil and into groundwater. DNREC inspection reports from 2010 to the present have documented elevated and rising nitrate levels in monitoring wells surrounding spray irrigation fields, a strong indication that Mountaire has applied its wastewater in excess of agronomic rates. Once these nitrates enter the local water table, they migrate away from the poultry processing plant and into the wells of nearby residents. The over-application of poultry processing wastewater and sanitary wastes has also resulted and will continue to result in discharges into groundwater.

Furthermore, Mountaire's storage of solid and/or liquid waste in anaerobic lagoons, barrier ditches, and spray irrigation storage lagoons has caused and is continuing to cause the discharge of untreated poultry processing wastewater and sanitary wastes directly into

5

groundwater. According to DNREC reports, Mountaire's anaerobic storage lagoons have a maximum capacity of 35.83 million gallons. With a 30-ml plastic liner in the lagoons, Mountaire has admitted that there is a leakage rate of 1x10-7 cm/s, meaning that millions of gallons of sanitary waste and poultry processing byproduct have seeped from the lagoons into the soil where no plants can use the nutrients, where the wastewater migrates into the groundwater below. Once this wastewater enters the water table, it migrates away from the poultry processing plant and into the wells of nearby resident. Upon information and belief, these discharges have been ongoing since the date these lagoons were brought into operation and have been continuous for at least the past five years. Mountaire has knowledge of the permeability rate for these lagoons, therefore knowing that waste would seep from the storage containers into the ground, where it would be discharged into groundwater. These ongoing discharges were confirmed by Mountaire's monitoring as well as United States Environmental Protection Agency ("EPA") and DNREC sampling of downgradient wells continuously since 2000. The seeping of untreated solid waste from the lagoons has contributed and is contributing to the excessive contamination of the groundwater, posing an imminent and substantial endangerment to health and the environment.

Upon information and belief, these practices and possibly others are responsible for groundwater contamination at levels beyond the Maximum Contaminant Level ("MCL") for specific chemicals. The MCLs are health-based standards that specify contaminants known to have an adverse effect on human health at levels beyond the parameters set forth by regulations. Here, samples indicate elevated levels of nitrate in nearby residential wells downgradient from Mountaire, as confirmed by private well sampling by the Department of Health and Social Services from 2002-2003, undated Mountaire sampling, and well sampling by DNREC in 2017. Attached hereto are maps showing the specific locations of the wells and other areas that were sampled. Observed levels for nitrate in monitoring wells located downgradient of Mountaire have been as high as 92.5 mg/l in 2016 and as high as 65.8 mg/L in 2017. A 2017 Notice of Violation from DNREC stated that the monitoring wells "have shown no improvement since Mountaire acquired" ownership of the facility in May of 2000. These results exceed the MCL for nitrate, in one instance by more than 9 times higher than the 10 mg/l limit. *See* 40 C.F.R. Part 141 and Appendix I. The results were also significantly higher than the nitrate results obtained from MW18 and MW34, the sampled monitoring wells located upgradient of Mountaire, which had a five-year average of 5.75 mg/l and 6.42 mg/l nitrate respectively, with no sampling events over the five-year period showing levels above 10 mg/l as is evidenced in the charts below:

6



Upon information and belief, these samples were taken between 2003-2017. These practices have been ongoing since Mountaire began its operations and have been continuous for at least the past five years.

The Community Plaintiffs use and consume well water that is downgradient from Mountaire. Upon information and belief, and based on the EPA and DNREC findings, and Mountaire's own sampling and monitoring results, these wells are contaminated predominantly because of Mountaire's discharges into the groundwater. Note that Mountaire has been sampling a number of the Community Plaintiffs' residential water, but has failed to provide the residents with the dates of sampling, including not dating the letters sent to them, and that sampling events occurred without notification to the residents. Human consumption of water containing more than 10 mg/l of nitrate causes a variety of severe health problems, including but not limited to methemoglobinemia ("blue baby syndrome," a potentially fatal condition that affects infants), some forms of cancer, and autoimmune system dysfunction. The excessive nitrates and other contaminants contained in these nearby wells are directly attributable to Mountaire's improper practices of storing, treating, transporting, and disposing (through application or otherwise) of solid wastes. There is evidence that chronic exposures to lower levels can contribute to a variety of severe health problems. As such, these practices may, and indeed do, present an imminent and substantial endangerment to health and the environment. Below are some of the sampling results that show an endangerment to public health:

| Household Residents | Domestic Water Nitrate Result in mg/l | Date |
| --- | --- | --- |
| Joan Balback Joseph Balback | 12.8 | 12/10/2017 |
| Carol Cordrey | 15.25 | Mountaire undated |
| Charles Cordrey Eleanor Cordrey | 20.2 | 12/6/2017 |
| Gerald Cordrey Jr. Tillie Cordrey | 10.3 | 11/17/2017 |
| Jeff Davis, Sr. Jeff Davis, Jr. | 10.8 | 12/6/2017 |
| Megan Gallagher Trevor Gallagher | 8.4 | 12/6/2017 |
| Brittany Hayes | 25.6 | |
| Colleen Hough Michael Hough | 19.4 | 12/6/2017 |
| Brannon Johnson | 31.4 | undated |
| Monica Johnson Tom Johnson | 26.92 | Mountaire undated |
| Lisa McCabe | 24.8 | |
| Eileen Mooney James Mooney | 7.65 | 12/1/2017 |
| Damon O'Leary Kim O'Leary | 14.0 | 1/30/2018 |

| | | |
|---|---|---|
| Tom O'Leary<br>Dylan O'Leary Welsko | | |
| Michael Orlen<br>Michelle Orlen | 8.8 | undated |
| Jean Phillips<br>Robert Phillips | 26.5 | 12/6/2017 |
| Donna Reid<br>James Reid<br>Tiffany Reid | 18.2 | 1/19/2018 |
| Nina Davis Rodriguez | 10.8 | undated |
| Bruce Sentman<br>Maryann Sentman | 22.8 | 11/14/2017 |
| Patsy Taylor | 12.7 | 4/29/2002 |
| Charles Wayne | 30 | Mountaire undated (2002) |
| Junior Wise<br>Martha Wise | 22 | Mountaire undated (2002) |
| Preston Wise<br>Wescenia Wise | 25.6 | Mountaire undated (2002) |

42 U.S.C. § 6972(a) states that the District Courts of the United States shall have jurisdiction to order any person who "has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" that presents an imminent and substantial endangerment to health or the environment to take such action as may be necessary to abate the endangerment. The Community Plaintiffs and Food & Water Watch intend to seek declaratory and injunctive relief in this lawsuit, and attorneys and expert witness fees and costs associated with the suit.

## VIOLATION OF RESOURCE CONSERVATION AND RECOVERY ACT: OPEN DUMPING

In addition to presenting an imminent and substantial endangerment to health and the environment, Mountaire's improper waste management practices constitute "open dumping" in violation of RCRA. 42 U.S.C. § 6945(a) prohibits the operation of "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste." "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste . . . into or on any land or water[.]" 42 U.S.C. § 6903(3). Enforcement of this prohibition is available through RCRA's citizen suit provision. *Id.* at § 6945(a). As required by statute, EPA has promulgated criteria under RCRA § 6907(a)(3) defining solid waste management practices that constitute open dumping. *See* 42 U.S.C. § 6944(a); 40 C.F.R. Parts 257 and 258. These regulations prohibit the contamination of any underground drinking water source beyond the solid waste boundary of a disposal site. 40 C.F.R. § 257.3-4(a).

The definition of "underground drinking water source" includes an aquifer supplying drinking water for human consumption. 40 C.F.R. § 257.3-4(c)(4). "Contaminate" means to introduce a substance that would cause: (i) the concentration of that substance in the groundwater to exceed the maximum contaminant level specified in Appendix I, or (ii) an increase in the

9

concentration of that substance in the groundwater where the existing concentration of that substance exceeds the MCLs specified in Appendix I. 40 C.F.R. § 257.3-4(c)(2).

Appendix I to 40 C.F.R. Part 257 lists the MCL for nitrate as 10 mg/l. Groundwater samples taken by the EPA and DNREC of wells downgradient from Mountaire revealed levels of nitrate in excess of the 10 mg/l MCL.[1]  The lawsuit will allege that Mountaire's past and present waste disposal practices have caused nitrate contamination to travel beyond the facility boundaries, in violation of RCRA's open dumping prohibitions.  DNREC inspection reports from 2010 to the present have documented elevated and rising nitrate levels in monitoring wells surrounding spray irrigation fields, a strong indication that Mountaire has applied its wastewater in excess of agronomic rates.  Additionally, DNREC inspection reports from 2015 to the present have indicated that effluent waste sprayed onto the disposal fields was above the 15.6 mg/L of Total Nitrogen limits allowed in Mountaire's spray irrigation permit.  Applying wastewater with more nutrients than allowed by the permit is a strong indication that Mountaire has applied its wastewater in excess of agronomic rates.  Applications beyond that which the current crop can effectively utilize causes nitrates to leach through soil and into groundwater, which in turn causes nitrate levels in the groundwater to exceed the MCLs.

The lawsuit will further allege that Mountaire's storage of solid waste in permeable lagoons has caused manure to seep into the groundwater and leave the boundaries of the site, also causing nitrate contamination of groundwater in excess of the MCL.  These practices have been ongoing since Mountaire began its operations and have been continuous for at least the past five years, as confirmed by an established monitoring program since at least 2003, private well sampling by the Department of Health and Social Services from 2002-2003, and well sampling by DNREC in 2017.

Pursuant to 42 U.S.C. § 6972(a), the Community Plaintiffs and Food & Water Watch intend to seek legal and equitable relief to remedy Mountaire's practice of open dumping.  The relief sought includes, but is not limited to, an assessment of past, present, and future response, remediation, removal, and/or clean-up costs, a requirement that the extent of the contamination be fully investigated and remediated, other necessary temporary and/or permanent injunctive relief, and an award of the attorney and expert witness fees and costs incurred in bringing the enforcement action.

---

[1] In particular, EPA reported nitrate levels of 23, 46.7, 44, 43.4, 30.2, 23.4, and 22.7 mg/l in seven of the eight downgradient wells, all above the MCL.

## PARTIES GIVING NOTICE

The names, telephone numbers, and addresses of the people giving this Notice of Intent to Sue are as follows:

Joan Balback
Joseph Balback
26643 Jersey Road
Millsboro, DE 19966
302-934-6251

Faye Burton
Titus Burton
27508 Herbert Lane
Millsboro, DE 19966
302-933-0550

Carol Cordrey
29706 John J Williams Hwy
Millsboro, DE 19966
302-934-6805

Charles Cordrey
Eleanor Cordrey
29719 John J Williams Hwy
Millsboro, DE 19966
302-934-8243

Gerald Cordrey Jr.
Tillie Cordrey
26703 Jersey Road
Millsboro, DE 19966
302-934-7983

Jeff Davis, Sr.
302-249-0480
Jeff Davis, Jr.
302-745-0329
28411 Justice Lane
Millsboro, DE 19966

Megan Gallagher
Trevor Gallagher
26583 Jersey Road
Millsboro, DE 19966
302-381-8093

Brittany Hayes
27504 Herbert Lane
Millsboro, DE 19966
302-933-0343

Colleen Hough
Michael Hough
26563 Jersey Road
Millsboro, DE 19966
302-947-1891

Brannon Johnson
26729 Jersey Road
Millsboro, DE 19966
302-933-0343

Monica Johnson
Tom Johnson
26756 Jersey Road
Millsboro, DE 19966
302-934-8904

Ernest Kollock
Ginger Kollock
26623 Jersey Road
Millsboro, DE 19966
302-933-8464

Lisa McCabe
28399 Justice Lane
Millsboro, DE 19966
302-542-7690

Eileen Mooney
James Mooney
28441 Justice Lane
Millsboro, DE 19966
302-228-3210

Damon O'Leary
26597 Jersey Road
Millsboro, DE 19966
302-604-1635

Kim O'Leary
Tom O'Leary
26597 Jersey Road
Millsboro, DE 19966
302-339-2549

Michael Orlen
Michelle Orlen
26602 Jersey Road
Millsboro, DE 19966
302-934-1552

Jean Phillips
Robert Phillips
28400 Justice Lane
Millsboro, DE 19966
302-236-4055

Donna Reid
James Reid
27494 Herbert Lane
Millsboro, DE 19966
302-934-8533

Tiffany Reid
27494 Herbert Lane
Millsboro, DE 19966
302-934-8533

Nina Davis Rodriguez
28411 Justice Lane
Millsboro, DE 19966
302-249-0480

Frances Schuck
26713 Jersey Road
Millsboro, DE 19966
302-727-9954

Bruce Sentman
Maryann Sentman
28440 Justice Lane
Millsboro, DE 19966
302-448-1069

Patsy Taylor
27510 Herbert Lane
Millsboro, DE 19966
215-221-6699

Daniel Turpin
Patricia Turpin
26581 Jersey Road
Millsboro, DE 19966
302-841-4279

Charles Wayne
26693 Jersey Road
Millsboro, DE 19966
302-663-0035

Dylan O'Leary Welsko
26597 Jersey Road
Millsboro, DE 19966
302-339-2549

Junior Wise
Martha Wise
27502 Herbert Lane
Millsboro, DE 19966
302-934-6886

Preston Wise
Wescenia Wise
27504 Herbert Lane
Millsboro, DE 19966
302-933-0343

Food & Water Watch
1616 P Street, NW,
Washington, DC 20036
(202) 683-2457
theinzen@fwwatch.org

14

The names, addresses, and phone numbers of Counsel for the parties giving this Notice of Intent to Sue are:

Chris Nidel
Nidel & Nace, PLLC
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
(202) 478-9677
chris@nidellaw.com

Tarah Heinzen
Food & Water Watch
1616 P Street, NW,
Washington, DC 20036
(202) 683-2457
theinzen@fwwatch.org

Thomas C. Crumplar, Esq. (#942)
Jacobs & Crumplar PA
750 Shipyard Dr., Suite 200
Wilmington, DE 19801
(302) 656-5445
Tom@jcdelaw.com

**Attorneys for Food & Water Watch.**

Jessica Culpepper
Public Justice
1620 L Street NW, Ste 620
Washington, DC 20006
(202) 797-8600
jculpper@publicjustice.net

**Attorneys for Plaintiffs.**

## CONCLUSION

We will be available to discuss effective remedies and actions that will assure Mountaire's future compliance with the Resource Conservation and Recovery Act and all other applicable state and federal environmental laws. If you wish to avail yourself of this opportunity, or if you have any questions regarding this letter, please contact the undersigned.

15

Sincerely,

*Jn L Culpepper*

_____

Jessica Culpepper
Public Justice, PC

Chris Nidel
Nidel & Nace, PLLC

*Via Certified Mail to the following:*

Scott Pruitt, Administrator
U.S. Environmental Protection Agency
Ariel Rios Bldg.
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

Registered Agent for Mountaire
Corporation
Janice A. Atterberry
1901 Napa Valley Dr.
Little Rock, AR 72212

Registered Agent for Mountaire Farms Inc.
and Mountaire Farms of Delaware, Inc.
The Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Cosmo Servidio, Regional Administrator
U.S. Environmental Protection Agency,
Region III
1650 Arch Street
Philadelphia, PA 19103-2029

Shawn M. Garvin, Secretary
Delaware Department of Natural Resources
and Environmental Control
89 Kings Highway
Dover, DE 19901

16

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STATE OF DELAWARE DEPARTMENT
OF NATURAL RESOURCES &
ENVIRONMENTAL CONTROL,

and

GARY and ANNA-MARIE CUPPELS,
individually and on behalf of others
similarly situated,

               Plaintiffs,

and

JOAN and JOSEPH BALBACK,
individually and on behalf of others
similarly situated; FOOD and WATER
WATCH, a Washington, D.C. Non-Profit
Corporation,

               *Proposed* Plaintiffs,

          v.

MOUNTAIRE FARMS OF DELAWARE,
INC., a Delaware Corporation,

               Defendant.

Case No.: 1:18-cv-00838-MN

## **AMENDED COMPLAINT IN INTERVENTION**[1]

---

[1] The Original Complaint in Intervention is amended to show that Food and Water Watch is the Proposed Intervenor, and to clarify language in paragraph one. A red-lined version showing the changes from the Original Complaint in Intervention, which was attached to Proposed Intervenors' Motion to Intervene, at D.I. 30-2, is attached as Exhibit E to the Amended Motion to Intervene.

Food & Water Watch ("FWW"), Joan and Joseph Balback (the "Balbacks"), and 45 similarly situated residents and property owners (collectively, "Plaintiff-Intervenors") bring this Complaint in Intervention (the "Complaint") seeking mandatory injunctive relief against defendant Mountaire Farms of Delaware, Inc. ("Mountaire") for violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), at its poultry processing facilities and agricultural fields (the "facilities") in Millsboro, Delaware.

## NATURE OF THIS ACTION

1.   Pursuant to 42 U.S.C. § 6972(a)(l)(B), citizens, including Plaintiff-Intervenors, are authorized to bring suit against any person who is the "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, treatment, storage or disposal of any solid or hazardous waste which may present an imminent and substantial threat to human health or the environment."

2.   The purpose of this suit is to protect Millsboro residents and property owners from well water contamination. Plaintiff-Intervenors seek mandatory injunctive relief against Mountaire for its past and present solid waste disposal practices at the facilities. Years of federal and state monitoring, including Mountaire's own internal monitoring and admissions, establish a traceable link between Mountaire's storage and application of wastewater (via agricultural field over-application and leak-prone lagoons) and unsafe levels of nitrate in Plaintiff-Intervenors' drinking water. Despite having knowledge of this contamination—specifically knowing that contamination exceeded its state-issued waste application permits—Mountaire persists in storing and disposing its waste in ways that imminently and substantially endanger public health and the environment.

2

3.      This violates RCRA. Plaintiff-Intervenors therefore seek orders declaring Mountaire's waste disposal and storage practices to be unlawful under RCRA and enjoining Mountaire from persisting in those violations, including any abatement and/or remediation necessary to end the ongoing endangerment to health and the environment. Plaintiff-Intervenors also seek attorneys' fees and costs incurred in bringing this action.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff-Intervenors' Section 7002(a)(1)(B) claim pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a). This applies equally to Plaintiff-Intervenors' Section 4005(a) ("open dump") claim, which is enforceable under Section 7002. 42 U.S.C. § 6945(a).

5.      Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), since both of Plaintiff-Intervenors' claims arise under RCRA.

6.      Venue is proper under Section 7002(a) of RCRA and under 28 U.S.C. § 1391(b), since Mountaire resides in this District and, alternatively, because the conduct, events, and properties giving rise to Plaintiff-Intervenors' claims are situated within this District.

## PARTIES

7.      Plaintiff-Intervenors are residents of Millsboro, Delaware, who live near Mountaire's facilities and rely on well water downgradient from those facilities.

   a. Resident Plaintiff-Intervenors—47 individuals, including the Balbacks—live and own property 125 feet to a half-mile downgradient from Mountaire's facilities.

3

b. FWW- Plaintiff-Intervenors also live and work downgradient from the facilities. FWW is a national, non-profit membership organization dedicated to healthy food and clean water for all. Pollution from industrial agriculture is one of FWW's priority issues, and FWW is engaged in several campaigns to reduce nutrient pollution nationally through stronger agricultural regulation, transparency, and enforcement. FWW and its active members, which include Resident Plaintiff-Intervenors, share a strong interest in securing clean drinking water for communities near large-scale agricultural operations.

8.  Plaintiff State of Delaware, Department of Natural Resources and Environmental Control ("DNREC") is an administrative agency of the State of Delaware established by Chapter 80 of Title 29 of the Delaware Code. DNREC is legislatively authorized to exercise the police power of the State of Delaware "in order to protect the health, safety, and welfare" of Delaware citizens. D.I. ¶¶ 1-3.

9.  Plaintiff-Intervenors Gary and Anna-Marie Cuppels, and more than 690 individuals similarly situated (the "Cuppels"), are Millsboro residents who reside "within five miles" of the facilities. D.I. 4-2 ¶ 1. The Cuppels "live on or regularly boat, fish, or otherwise pursue recreational activities" on the Indian River and its tributaries. *Id.*

10. Defendant Mountaire is a corporation organized and operating under the laws of the State of Delaware, with its principle place of business located at 29005 John J. Williams Highway, Millsboro, Delaware 19966. The facilities are also located at that address.

## FACTUAL BACKGROUND

11. Mountaire acquired ownership of the facilities in 2000. It has been solely responsible for the facilities' operations since that time.

4

12.     The facilities include a poultry processing plant, wastewater treatment facilities, approximately 928 acres of agricultural fields permitted for spray irrigation (the "spray fields"), and two anaerobic lagoons in addition to a spray irrigation lagoon used for waste storage (the "lagoons"). The lagoons have a combined wastewater storage capacity of 35.83 million gallons.

13.     Mountaire slaughters approximately 2 million chickens at its processing plant each week. This produces roughly 2.4 million gallons of waste per day. The waste produced includes feathers, dirt, fecal matter, blood, slaughtering wastewater, carcass parts, grit, sand, gravel, flesh, fat, grease, chiller wastewater, processing wastewater, cleanup wastewater, and sanitary waste from Mountaire's employees.

14.     Mountaire disposes part of that waste onto its spray fields pursuant to a State of Delaware Spray Irrigation Operations Permit (No. 359191-04) (the "Spray Permit"). The rest is stored for treatment and future field application in Mountaire's lagoons.

15.     The Spray Permit allows Mountaire an annual application rate of 320 lbs/acre of nitrogen and a monthly total nitrogen concentration ("TNC") of 15.6 mg/L. The application rate is a measure of how much nitrogen Mountaire applies to its spray fields each year; the TNC is a post-treatment measure of the amount of nitrogen in Mountaire's waste.

16.     Mountaire has applied, currently does apply, and is reasonably likely to continue to annually apply waste onto its spray fields in amounts that exceed the 320 lbs/acre allowed under the Spray Permit. DNREC inspection reports from 2015 to the present show that Mountaire regularly applied nutrients to its spray fields in excess of its 320 lbs/acre annual application rate. For example, in 2017, Mountaire exceeded its annual application rate on 11 of its 13 spray fields; six of those fields exceeded the annual rate in August alone.

17.     Mountaire has routinely applied and will likely continue to apply effluent waste with TNCs above the Spray Permit's 15.6mg/L limit. DNREC inspection reports from 2015 to the present confirm TNCs consistently in excess of that limit. These levels are frequently extreme, regularly reaching above 100 mg/L. In September of 2017, for example, Mountaire's effluent TNC reached 641 mg/L—forty times the Spray Permit's limit.

18.     Mountaire has also admitted that its lagoons suffer a leakage rate of $10^7$ cm/s. This suggests that potentially hundreds of gallons of treated and untreated waste escapes from Mountaire's lagoons and into the surrounding soil every day.

19.     Nutrient pollution from spray fields and leak-prone lagoons is a common feature of large-scale agricultural operations. It can occur when excess chemicals like nitrogen (including nitrogen compounds such as nitrate) leach through the soil and into groundwater.

20.     Nitrate acts as a fertilizer; however, crops can only absorb it in limited amounts. When applied at levels that exceed a crop's fertilization needs (the "agronomic rate"), excess nitrate accumulates in the soil. This can leach into surrounding groundwater.

21.     Nitrate is considered a "contaminant" by the Environmental Protection Agency ("EPA") pursuant to its authority under the Safe Drinking Water Act, 42 U.S.C. § 300f et seq. ("SDWA"), because the agency determined that its presence in drinking water "may have an adverse affect" on human health. 42 U.S.C. § 300g-1(b)(1)(A). EPA set the maximum "permissible" drinking water concentration for nitrate at 10 mg/L (the "maximum contaminant level" or "MCL"). 42 U.S.C. § 300f(3); 40 C.F.R. § 141.62(b)(7).

22.     EPA arrived at 10 mg/L in part because it found that "[i]nfants below the age of six months who drink water containing nitrate in excess of the MCL could become seriously ill"—contracting blood disorders like methemoglobinemia ("blue-baby syndrome")—"and, if

6

untreated, may die."[2] Indeed, consumption of water high in nitrates enhances the risk of severe

health problems for people of all ages—including (but not limited to) birth defects, a variety of

cancers, and autoimmune system dysfunction. Pregnant women and fetuses are particularly

vulnerable to the negative health effects of chronic nitrate exposure.

23.     Mountaire's facilities are located on two major aquifers (bodies of permeable rock

that contain and transmit groundwater): the Columbia Surficial aquifer and the Chesapeake

aquifer. Both supply drinking water to Plaintiff-Intervenors' water wells.

24.     Water samples taken by EPA and DNREC from wells downgradient of

Mountaire's facilities have consistently yielded nitrate concentrations above the 10 mg/L MCL.

Since 2010, for example, DNREC has documented elevated and rising nitrate levels—far above

the 10 mg/L MCL—in wells downgradient from Mountaire's facilities.

25.     Seven wells downgradient from Mountaire's facilities have tested above 10 mg/L

every year from 2003 to 2017. In 2016, downgradient groundwater monitoring yielded

concentrations as high as 92.5 mg/L; in 2017, nitrate concentrations reached as high as 65.8

mg/L.

26.     These results are significantly higher than five-year average concentrations from

two wells *upgradient* of Mountaire's facilities. Those yielded average concentrations of 5.75

mg/L and 6.42 mg/L, respectively, with neither well yielding results above the 10 mg/L MCL.

27.     Plaintiff-Intervenors rely on well water downgradient from Mountaire's facilities.

They use the water from their wells multiple times each day—to bathe themselves and their

children, wash their dishes, clean their produce, and to drink.

---

[2] EPA, National Primary Drinking Water Regulations: Inorganic Chemicals: Nitrate, *available at* https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#Inorganic (last visited May 2, 2019).

28.     Mountaire's operational practices at the facilities have caused and are causing ongoing harm to the groundwater in the Columbia Surficial and Chesapeake aquifers. In addition to spraying and negligently storing waste that exceeds the Spray Permit's 15.6 mg/L TNC, Mountaire routinely applies that waste in excess of its 320 lbs/acre annual application rate.

29.     The resultant leaching of treated and untreated waste from Mountaire's over-sprayed fields and leak-prone lagoons has contributed and is contributing to nitrate levels that exceed the MCL in Plaintiff-Intervenors' water wells.

## PROCEDURAL HISTORY

30.     In 2002—two years after Mountaire assumed control of the facilities—EPA determined that Mountaire had contaminated the wells beneath and downgradient from its facilities, in violation of the SDWA. EPA found that the wells' routine sampling above the nitrate MCL presented an imminent and substantial endangerment to public health.

31.     EPA entered into a consent decree and order with Mountaire in 2003 (the "2003 Order"). That agreement was based on EPA's conclusion that "poultry operations at the [facilities] have impacted the nitrate levels in the ground water used as a source of drinking water and therefore caused or contributed to the contamination of the [groundwater] underlying the [facilities]." The 2003 Order identified at least ten residences downgradient from the facilities whose wells contained water with nitrate concentrations above the MCL. Mountaire agreed, *inter alia*, to provide emergency alternative drinking water to residences whose wells were contaminated and to remediate the facilities' groundwater in order to reduce the nitrate levels below the MCL.

32.     On July 21, 2005, Mountaire submitted a request to EPA to terminate the 2003 Order. EPA rejected Mountaire's request; it determined that Mountaire had failed to "maintain

8

point of use treatment devices on the residences identified" in the 2003 Order. In fact, of the ten identified residences with nitrate-contaminated water, Mountaire had maintained point of use treatment devices at only a single residence.

33.     Mountaire's violations of the 2003 Order continued, eventually causing DNREC to intervene. On September 7, 2010—a year after DNREC issued Mountaire the Spray Permit— the agency's Groundwater Discharges division sent Mountaire a notice of non-compliance ("2010 Notice") as a result of nitrate concentrations in numerous monitoring wells exceeding the Spray Permit's TNC.

34.     According to the 2010 Notice, monitoring wells in and downgradient from Mountaire's facilities had consistently shown average nitrate concentrations of 25 mg/L.

35.     Mountaire proposed a number of wastewater treatment upgrades in response to the 2010 Notice. These were designed to achieve an effluent TNC beneath 15.6 mg/L, in compliance with Mountaire's Spray Permit.

36.     Ultimately, these upgrades did not solve the problem. In fact, at the end of August 2017, Mountaire discovered that its wastewater treatment facility ("WWTF") "was in failure" due to a buildup of solids throughout the WWTF and a depletion of oxygen in the aerobic portions of the WWTF (the "2017 System Failure"). D.I. 7, Ex. B ¶ 5.

37.     These failures resulted in Mountaire's effluent waste TNCs exceeding the 15.6 mg/L allowed under the Spray Permit.

38.     Because of ongoing violations of the Spray Permit's TNC, DNREC issued Mountaire's 2017 Spray Permit renewal with a Schedule of Compliance (the "Schedule"). The Schedule required Mountaire to submit a "Corrective Action Work Plan" by August 31, 2017, addressing the TNC exceedances. D.I. 7, Ex. B ¶ 10.

39.     Mountaire's failed to submit a Corrective Action Work Plan. Due to this failure and the persistent violations of the Spray Permit's conditions, DNREC issued a second notice of violation in November 2017 (the "2017 NOV"), which outlined the following violations:

    a. Since 2010, Mountaire's effluent TNCs have routinely been above 100 mg/L.

    b. TNCs have consistently exceeded the Spray Permit's 15.6 mg/L since 2015, reaching as high as 76.75 mg/mL in April 2017 and 641 mg/L in 2017.

    c. On September 5, 2017, DNREC received a notice that Mountaire was collecting effluent composite samples from an invalid sampling point.

    d. On August 31, 2017, grab samples collected at spray pivots (i.e., from wastewater outputs used to apply waste to Mountaire's spray fields) showed Fecal Coliform levels exceeding 1,000,000 col/100mL. The same samples showed total chlorine residual at 0.2 mg/L, well beneath the 1.0 mg/mL minimum set out in Mountaire's Spray Permit.

    e. On September 7, 2017, Mountaire notified DNREC that not all flow from its clarifiers discharged into the storage lagoon, but instead some raw waste was being pumped directly into central pivots and then applied onto Mountaire's spray fields.

    f. Mountaire's treated wastewater routinely exceeded the daily permissible average concentration of Biochemical Oxygen Demand (BOD5), 50 mg/L. From 2015 through 2017, Mountaire violated this standard 29 times, with daily average BOD5 levels reaching as high as 1200 mg/L, or twenty-four times the permissible concentration.

g.Mountaire's treated wastewater routinely exceeded the daily permissible

average concentration of Total Suspended Solids (TSS), 50 mg/L. In 2016 and

2017, Mountaire violated this standard twenty-four times, with daily average

TSS concentrations reaching as high as 4220 mg/L, or over eighty-four times

the permissible concentration.

h.Mountaire's treated wastewater routinely exceeded the daily permissible

average concentration of Fecal Coliform, 200 col/100mL. In 2017, Mountaire

violated this standard nine times, with daily average Fecal Coliform

concentrations reaching as high as 1,100,000 mg/L, or 5,500 times the

permissible concentration.

i. Mountaire's treated wastewater routinely failed to maintain a Total Chlorine

Residual between 1.0 mg/L, and 4.0mg/L. In 2017, Mountaire failed to report

Total Chlorine Residual values in their July and August reports. Nonetheless,

Mountaire's treated wastewater contained less than 1.0 mg/L residual chlorine

sixteen times in September alone.

40.     DNREC concluded that that the "interim measures" implemented by Mountaire

after the 2017 System Failure "have not and cannot consistently achieve full compliance with the

Spray Permit" until Mountaire achieved long-term upgrades to the WWTF. D.I. 7, Ex. B ¶ 16.

41.     DNREC also concluded that Mountaire's wastewater treatment facility and spray

irrigation system had caused groundwater to exceed the MCL for nitrate, with levels reaching as

high as 92.5 mg/L in 2016 and 65.8 mg/L in 2017.

42.     Mountaire has repeatedly failed to notify DNREC of its noncompliance. Despite Total Nitrate concentrations having exceeded permitted levels since 2015, Mountaire failed to notify DNREC until September 20, 2017.

43.     Mountaire also failed to notify DNREC that not all effluent from its wastewater treatment plant was flowing into its lagoons. Instead, untreated wastes had bypassed the lagoons and were being sprayed directly onto Mountaire's spray fields. Mountaire notified DNREC only after the agency sent a letter on September 15, 2017, requiring Mountaire to do so.

44.     Mountaire's substantive and procedural violations of the Spray Permit are ongoing. Its waste storage and application practices continue to overload the facilities' fields with nitrate and other harmful contaminants, preventing Millsboro's aquifers—and the wells they supply—from providing Plaintiff-Intervenors with safe drinking water.

45.     For this reason, Plaintiff-Intervenors sent Mountaire, DNREC and EPA notice[3] of their intent to sue on March 27, 2018 (the "NOI"), pursuant to subsection (b)(2)(A) of RCRA's citizen suit provision, 42 U.S.C. § 6972. The NOI detailed Mountaire's Spray Permit noncompliance (discussing sampling results from Mountaire's spray fields and from wells in and around the facilities) and informed Mountaire of Plaintiff-Intervenors' intent to bring two separate claims under RCRA—an "endangerment" claim and an "open dump" claim, 42 U.S.C. §§ 6972(a)(1)(B) and 6945(a), respectively. *See* Ex. A at 3-10.

46.     On May 2, 2018, the Cuppels sent a separate notice of their intent to sue Mountaire. They alleged the same two RCRA claims as Plaintiff-Intervenors, in addition to a claim under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) ("CWA"). *See* D.I. 4-3 at pp. 4-16 of 83.

---

[3] Attached to Plaintiff-Intervenors' Motion as Exhibit A.

47. Section 7002(b)(2)(A) of RCRA required that Plaintiff-Intervenors and the Cuppels wait 90 days after the receipt of their notices to bring their RCRA claims against Mountaire. 42 U.S.C. § 6972(b)(2)(A).

48. On June 4, 2018, DNREC simultaneously filed a verified complaint in this Court (the "federal action") and a complaint in Delaware Superior Court (the "state action"). DNREC's federal action alleged the same two claims Plaintiff-Intervenors and the Cuppels intended to bring under RCRA, as well as the CWA claim the Cuppels had alleged in their notice letter. *See* D.I. 1 ¶¶ 31-39. DNREC alleged 15 claims in the state action (various permit, monitoring, and notice violations) pursuant to its enforcement authority under Section 6005 of the State of Delaware Code, 7 Del. Code Ann. § 6005.

49. The same day DNREC filed its complaints, it also entered into a Consent Decree (the "Decree") with Mountaire. The Decree focuses on the 2017 System Failure at Mountaire's facilities and seeks to moot Mountaire's liability to DNREC under RCRA and the CWA, provided that Mountaire implement various "Mitigation Measures." D.I. 7, Ex. B ¶¶ 5-13, 25-27, 62. Both parties submitted the Decree for approval in Delaware Superior Court.

50. DNREC's federal action was filed 69 days after Plaintiff-Intervenors' NOI and 33 days after the Cuppels' notice of intent to sue—before Plaintiff-Intervenors or the Cuppels could bring their claims under RCRA and before the Cuppels could bring their CWA claim. *See* 42 U.S.C. § 6972(b)(2)(A); 33 U.S.C. § 1365(b)(1)(A).

51. Plaintiff-Intervenors were therefore precluded from bringing their RCRA claims when DNREC filed its verified complaint in the Court on June 4, 2018. *See* 42 U.S.C. § 6972(b)(2)(C)(i).

52.     Plaintiff-Intervenors moved to intervene in the state action on June 8, 2018, three days after the Cuppels also moved to intervene in that action.

53.     The Cuppels moved to intervene in this action on June 29, 2018. That motion was granted by this Court on March 25, 2019. *Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*, No. CV 18-838 (MN), 2019 WL 1333266, at *7 (D. Del. Mar. 25, 2019).

54.     Four days later—without ruling on Plaintiff-Intervenors' or the Cuppels' motions to intervene or approving the Decree—the Delaware Superior Court stayed the state action. *See Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*, No. CV S18M-06-002 RFS, 2019 WL 1430620, at *5 (Del. Super. Ct. Mar. 29, 2019). It cited concerns with DNREC's raising RCRA and CWA issues in its complaint and the Decree's partial mooting of Mountaire's liability under both federal statutes—despite all 15 of DNREC's claims arising under state law.[4] *Id.* The court concluded that "[t]he resolution of the [federal action]" before the state action or Decree were allowed to proceed "will allow for the RCRA and CWA issues to be addressed and resolved rather than foreclosed" to Plaintiff-Intervenors and the Cuppels. *Id.*

55.     This Complaint is attached as part of Plaintiff-Intervenors' Motion pursuant to Section 7002(b)(2)(E) of RCRA, 42 U.S.C. § 6972(b)(2)(E), and in accordance with Federal Rule of Civil Procedure 24(c). Plaintiff-Intervenors submit this Complaint in order to "set[] out the claim[s] … for which intervention is sought." Fed. R. Civ. P. 24(c).

## COUNT I

## VIOLATION OF RCRA – Endangerment to Health or the Environment

---

[4] Specifically, the court was unsettled by DNREC's "rubber stamp" request—that the court should "defer" to DNREC and approve the Decree "without any review." *Id.* at *4.

56.    Plaintiff-Intervenors adopt and incorporate the preceding paragraphs by reference.

57.    Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), authorizes "any person" to bring suit against a past or present generator, transporter, or owner or operator of a "treatment, storage, or disposal facility" who has contributed or is contributing to the "past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

58.    Plaintiff-Intervenors are "person[s]" under Section 7002(a)(1)(B) because they are a group of individuals. 42 U.S.C. § 6903(15).

59.    Mountaire is a generator, transporter, and owner and/or operator of the facilities— which include waste treatment, storage, and disposal operations—and is contributing to the past and present "storage, treatment, transportation and/or disposal" of solid wastes.

60.    Mountaire's wastewater constitutes "solid waste" under RCRA because it includes "any ... discarded material, including solid, liquid, semisolid ... material resulting from industrial, commercial ... and agricultural operations[.]" 42 U.S.C. § 6903(27).

61.    Mountaire's operations involve solid waste "disposal" because they "discharge, deposit, inject[], dump[], spill[] ... or leak[]" poultry and sanitary wastewater onto "land or water so that such solid waste ... or any constituent thereof may [be] ... discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

62.    Mountaire's routine and ongoing storage, treatment, transportation, and disposal of poultry and sanitary wastewater—solid wastes that exceed the Spray Permit's TNC and are applied in excess of its annual application rate—is traceable to nitrate MCL exceedances in Plaintiff-Intervenors' downgradient well water. Plaintiff-Intervenors rely on this water for drinking, bathing, and otherwise consuming. Mountaire's practices therefore present an

imminent and substantial endangerment to the health of nearby residents and are unlawful under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

## COUNT II

## VIOLATION OF RCRA – Open Dumping

63.  Plaintiff-Intervenors adopt and incorporate the preceding paragraphs by reference.

64.  Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), prohibits the operation of "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste." Enforcement of this prohibition is available through RCRA's citizen suit provision, 42 U.S.C. § 6972. 42 U.S.C. § 6945(a).

65.  "Disposal" means any "discharge, deposit, injection, dumping, spilling … or leaking" of solid waste onto "land or water so that such solid waste … or any constituent thereof may [be] … discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

66.  EPA has promulgated criteria under Section 1008(a)(3) of RCRA, 42 U.S.C. § 6907(a)(3), defining solid waste management practices which constitute "open dumping." 40 C.F.R. Pts. 257-58. These criteria define "open dumping" as solid waste management practices which "contaminate" an "underground drinking water source" located beyond the "solid waste boundary" of the disposal site. 40 C.F.R. § 257.3-4(a).

67.  "Contaminate" means to introduce a substance that would cause (i) the concentration of that substance in the groundwater to exceed its MCL or (ii) an increase in the concentration of that substance in the groundwater where the existing concentration of that substance exceeds its MCL. 40 C.F.R. § 257.3-4(c)(2).

68.  "[U]nderground drinking water source" includes aquifers supplying drinking water for human consumption. 40 C.F.R. § 257.3-4(c)(4)(i).

16

69. "Solid waste boundary" means the solid waste's "outermost perimeter … as it would exist at completion of the disposal activity." 40 C.F.R. § 257.3-4(c)(5).

70. Groundwater samples taken by the EPA and DNREC from wells downgradient of Mountaire's facilities have consistently yielded nitrate concentrations in excess of the MCL. 40 C.F.R. § Pt. 257, App. I.

71. Mountaire's past and present waste disposal practices at the facilities have caused nitrate to travel downgradient—beyond the facility's solid waste boundaries—and contaminate Plaintiff-Intervenors' underground drinking water sources. This constitutes "open dumping" under RCRA and violates Section 4005(a), 42 U.S.C. § 6945(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Intervenors respectfully request that this Court provide them with the following relief:

A. Allow Plaintiff-Intervenors to intervene and fully participate as Plaintiffs in the present action;

B. Declare Mountaire to be in violation of RCRA;

C. Enter a preliminary and permanent injunction prohibiting Mountaire from engaging in solid waste storage and disposal practices that imminently and substantially endanger health or the environment;

D. Enter a preliminary and permanent injunction prohibiting Mountaire from engaging in solid waste storage and disposal practices that constitute "open dumping";

E.  Order Mountaire to provide Plaintiff-Intervenors with an alternative water supply until their well water's nitrate concentration consistently registers below the MCL, at no cost to Plaintiff-Intervenors;

F.  Order Mountaire to upgrade and modify its solid waste treatment, storage and disposal operations in order to achieve ongoing compliance with any permits, laws, regulations, or industry standards that might apply thereto;

G.  Order Mountaire to remediate the contaminated groundwater and Plaintiff-Intervenors' well water in order to remedy past, current, and ongoing negative health and environmental impacts;

H.  Award Plaintiff-Intervenors the costs and expenses of this action, including all attorneys' fees; and

I.  Award such further relief as this Court deems just and proper.

Dated: June 12, 2019                            Respectfully submitted,

                                                JACOBS & CRUMPLAR, P.A.

                                                /s/ Raeann Warner
                                                Raeann Warner, Esq. (#4931)
                                                Thomas C. Crumplar, Esq. (#942)
                                                Patrick Gallagher, Esq. (#5170)
                                                750 Shipyard Dr., Suite 200
                                                Wilmington, DE 19801
                                                (302) 656-5445
                                                Raeann@jcdelaw.com

                                                Of Counsel:

NIDEL & NACE, P.L.L.C.

Christopher T. Nidel, Esq. (to be admitted
pro-hac vice)
Jonathan B. Nace, Esq. (to be admitted pro
hac vice)
5335 Wisconsin Ave., NW
Suite 440
Washington, DC 20015
202-478-9677
chris@nidellaw.com
jon@nidellaw.com

Counsel for Community Plaintiffs and Food
and Water Watch


Tarah Heinzen (to be admitted pro-hac vice)
Food & Water Watch
1616 P Street, NW,
Washington, DC 20036
(202) 683-2457
theinzen@fwwatch.org

**Attorneys for Food & Water Watch**


Jessica Culpepper (to be admitted pro-hac vice)
Public Justice
1620 L Street NW, Ste 620
Washington, DC 20006
(202) 797-8600
jculpper@publicjustice.net

**Attorneys for Plaintiffs**

# Exhibit C

**EFiled:  May 31 2019 11:45AM EDT**
**Filing ID 63310614**
**Case Number 183,2019**

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | § | |
| DEPARTMENT OF NATURAL | § | |
| RESOURCES AND | § | No. 183, 2019 |
| ENVIRONMENTAL CONTROL, | § | |
| | § | Court Below—Superior Court |
| Plaintiff Below, | § | of the State of Delaware |
| Appellant, | § | |
| | § | C.A. No. S18M-06-002 |
| v. | § | |
| | § | |
| MOUNTAIRE FARMS OF | § | |
| DELAWARE, INC., | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted:  May 3, 2019
Decided:    May 31, 2019

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

## O R D E R

After consideration of the notice of appeal from an interlocutory order and the supplemental notice of appeal from an interlocutory order, it appears to the Court that:

(1)     The appellant, State of Delaware Department of Natural Resources and Environmental Control ("DNREC"), has petitioned this Court under Supreme Court Rule 42 to accept an appeal from the Superior Court's order dated March 29, 2019, which stayed DNREC's case claiming that appellee Mountaire Farms of Delaware,

Inc. violated environmental laws in favor of pending litigation brought by DNREC against Mountaire in federal court.

(2)     Mountaire operates a poultry processing plant in Sussex County.  In order to dispose of waste from the manufacturing process, Mountaire sprays effluent in certain areas and applies sludge elsewhere.  The disposal is governed by various environmental laws and regulations and two permits.  DNREC alleges that after Mountaire's wastewater treatment facility failed in August 2017, Mountaire illegally disposed of effluents; DNREC further alleges that the operation of the wastewater treatment facility and the effluent disposal have caused groundwater contamination. After DNREC learned in September 2017 of the failure of the wastewater treatment facility, it began to investigate the failure, developed a corrective action plan, and monitored Mountaire's compliance with a Notice of Violation issued by DNREC. In May 2018, DNREC and Mountaire entered into a consent decree that, among other things, would require Mountaire to take certain corrective measures, pay civil penalties for past violations, and pay future penalties if Mountaire fails to perform its obligations under the consent decree.  By its terms, the consent decree would become effective when entered by the Superior Court.

(3)     On June 4, 2018, DNREC commenced an action in the Superior Court (the "State Action"), asserting, among other things, violations of the Delaware Environmental Control Act, Delaware environmental regulations, and the Mountaire

permits. DNREC filed the consent decree with the complaint in the State Action. DNREC also commenced a separate enforcement action against Mountaire in the United States District Court for the District of Delaware (the "Federal Action"), in which DNREC alleged violations of the federal Resource Conservation and Recovery Act ("RCRA") and the federal Clean Water Act ("CWA"). Two groups of local residents, property owners, and other interested parties (the "Cuppels" and the "Balbacks") sought to intervene in the State Action. The Cuppels also sought to intervene in the Federal Action. Shortly after DNREC filed the State Action, the Cuppels filed a class-action lawsuit in the Superior Court, asserting tort claims arising out of Mountaire's activities, and the Balbacks also filed a separate complaint in the Superior Court alleging tort claims against Mountaire.

(4)    The motions to intervene in the State Action were briefed, and the Superior Court heard oral argument on the motions in November 2018. On March 25, 2019, the District Court granted the Cuppels' motion to intervene in the Federal Action. On March 29, 2019, after considering the motions to intervene, the Superior Court entered an order staying the State Action until the Federal Action could be resolved.[1]  Among other things, the Superior Court concluded that the complaint in

---

[1] *Dep't of Natural Resources & Envt'l Control v. Mountaire Farms of Del., Inc.*, 2019 WL 1430620 (Del. Super. Ct. Mar. 29, 2019). *See also Dep't of Natural Resources & Envt'l Control v. Mountaire Farms of Delaware, Inc.*, 2019 WL 1949722 (Del. Super. Ct. Apr. 30, 2019) ("The Court did not grant or deny the Cuppels and Balbacks' motions to intervene. Instead, its review of the motions to intervene led it to conclude that a stay of this action was appropriate . . . .").

3

the State Action "invokes RCRA and CWA issues;"[2] the consent decree could be found to relieve Mountaire of liability under RCRA and CWA and render the Federal Action moot;[3] the potential intervenors did not agree that Mountaire's polluting activities were limited to the time period following the failure of the wastewater treatment facility;[4] and "federal courts have exclusive jurisdiction over RCRA and CWA citizen suits."[5] The Superior Court further held that a stay would promote justice by allowing the potential intervenors to be heard on their claims and would also promote judicial economy.[6]

(5)     The Superior Court denied DNREC's application for certification of an interlocutory appeal.[7] The court held that the order staying the action did not decide a "substantial issue of material importance"[8] because it did not go to the substantive merits of the case.[9] The court also determined that "none of the eight factors set forth in Rule 42(b)(iii)(A)-(H) are implicated," certification would "not promote the

---

[2] *Mountaire*, 2019 WL 1430620, at *2.

[3] *Id.*

[4] *Id.* at *3.

[5] *Id.*

[6] *Id.* at *4.

[7] *Mountaire*, 2019 WL 1949722.

[8] DEL. SUPR. CT. R. 42(b)(i).

[9] *See Mountaire*, 2019 WL 1949722, at *2 (citing *Lima Delta Co. v. Global Aerospace, Inc.*, 2016 WL 3659859 (Del. Super. Ct. Mar. 17, 2016), *appeal refused*, 2016 WL 1436582 (Del. Apr. 5, 2016)).

most efficient and just schedule to resolve this case," and "the likely benefits of interlocutory review will not outweigh the probable costs."[10]

(6)    We agree that interlocutory review is not warranted in this case. Applications for interlocutory review are addressed to the sound discretion of this Court.[11]  In the exercise of its discretion and giving great weight to the trial court's view, this Court has concluded that the application for interlocutory review does not meet the strict standards for certification under Supreme Court Rule 42(b). Exceptional circumstances that would merit interlocutory review of the decision of the Superior Court do not exist in this case,[12] and the potential benefits of interlocutory review do not outweigh the inefficiency, disruption, and probable costs caused by an interlocutory appeal.

NOW, THEREFORE, IT IS ORDERED that the interlocutory appeal is REFUSED.

BY THE COURT:


/s/Gary F. Traynor
Justice

---

[10] *Id.*
[11] DEL. SUPR. CT. R. 42(d)(v).
[12] DEL. SUPR. CT. R. 42(b)(ii).

5

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STATE OF DELAWARE DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL, | |
| and | |
| GARY and ANNA-MARIE CUPPELS, individually and on behalf of others similarly situated, | |
| Plaintiffs, | Case No.: 1:18-cv-00838-MN |
| v. | |
| MOUNTAIRE FARMS OF DELAWARE, INC., | |
| Defendant. | |

**AMENDED
MOTION TO INTERVENE**[1]

Joan and Joseph Balback, 45 similarly situated residents and property owners, and members of Food & Water Watch ("FWW") (collectively, "Intervenors") who rely on drinking water in the vicinity of the lands and facilities owned and operated by Mountaire Corporation, Mountaire Farms, Inc., and Mountaire Farms of Delaware, Inc. (collectively, "Mountaire")

---

[1] The Proposed Intervenors' Original Motion to Intervene, D.I. 30, is changed just to clarify that Food & Water Watch itself, not its members, are among the Proposed Intervenors, and to fix formatting issues. The changes from the Original Motion to Intervene and the Amended Motion to Intervene are shown in the attached Exhibit D in redlined version for ease of the Court and parties in reviewing. The changes from the Original Complaint in Intervention, at D.I. 30-2, to the Amended Complaint in Intervention, at Exhibit B, are also shown in redline, and attached at Exhibit E.

respectfully submit this Motion to Intervene ("Motion") pursuant to Rule 24 of the Federal Rules of Civil Procedure and 42 U.S.C. § 6972(b)(2)(E).

I.   **INTRODUCTION**

Intervenors are residents and property owners in Millsboro, Delaware, who rely on drinking water from private wells located near Mountaire's poultry processing facilities and agricultural fields (the "facilities"). Each day, Mountaire's facilities produce up to 2.4 million gallons of waste, which it sprays onto 928 acres of surrounding farmland. Plaintiff, the State of Delaware's Department of Natural Resources and Environmental Control ("DNREC"), permits this discharge pursuant to a Spray Irrigation Permit (No. 359191-04) (the "Spray Permit") and allows Mountaire to apply solid "sludge" waste to its fields pursuant to two land application permits (Nos. AGU 1402-S-03 and AGU 1403-S-03) (the "Sludge Permits"). Mountaire also maintains various solid and/or liquid waste storage lagoons in and around the facilities.

Over the years, billions of gallons of waste have seeped through the soil and into the groundwater surrounding Mountaire's facilities. This is no accident. Since acquiring the facilities in 2000, Mountaire has continuously over-sprayed wastewater onto its fields and negligently stored liquid and solid waste in leak-prone lagoons. Once in the groundwater, these pollutants— high in nitrogen compounds like nitrate—travel downgradient into private water wells. This endangers the health of Intervenors, who rely on their well water for drinking, bathing, and other basic domestic needs. Indeed, chronic exposure to nitrates contributes to a variety of severe health and developmental problems. Despite the substantial health risks associated with its waste exceedances and knowing violations of its own permits, Mountaire continues to contaminate Millsboro's groundwater.

2

This contamination will continue until Mountaire is forced to amend its operational practices and remedy the harm already caused. For this reason, Intervenors sent a Notice of Intent[2] to sue Mountaire under two separate provisions of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), on March 27, 2018. That effort was then preempted in June of 2018, when DNREC filed its complaint in this case, D.I. 1, along with a simultaneous complaint (the "state action") and Consent Decree (the "Decree") in Delaware superior court. Intervenors viewed the state action as potentially decisive of their interests, choosing to intervene first in that case. Now that the state action is stayed—for the express purpose of allowing this case to proceed—Intervenors seek to intervene in this action pursuant to their statutory rights under RCRA and Federal Rule of Civil Procedure 24 ("Rule 24").

II.    **ARGUMENT**

    **A. Intervenors have a Right to Intervene.**

Parties must be allowed to intervene where, "[o]n timely motion," they demonstrate that (1) a federal statute "unconditional[ly]" grants intervention or (2) their interest in the "subject of the action" is threatened and not "adequately represent[ed]" by the existing parties. Fed. R. Civ. P. 24(a); *see also Commonwealth of Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 (3d Cir. 2018). Unlike Rule 24(b)—which gives courts discretion over would-be intervenors with conditional statutory rights or relevant (but non-essential) interests—Rule 24(a) *requires* that courts grant timely motions setting out (1) or (2) above.

Intervenors meet Rule 24(a)'s requirements. As this Court has already recognized, Section 7002(b)(2)(E) of RCRA, 42 U.S.C. § 6972(b)(2)(E), provides the right to intervene under Rule 24(a). *See Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*,

    [ Formatted: Font: 12 pt ]

_____

[2] Attached hereto as Exhibit A.

    [ Formatted: Font: 12 pt ]

No. CV 18-838 (MN), 2019 WL 1333266, at *6 (D. Del. Mar. 25, 2019). Intervenors qualify for

intervention under RCRA and Rule 24(a) for the same reason: they have clear interests that go to

the core of this action, and disposing this action in their absence would impair Intervenors'

ability to protect those interests.[3]

### i. Intervenors have established interests in the subject of this action.

Intervenors rely on the well water downgradient from Mountaire's facilities. Resident

Intervenors live and own property north of the Indian River, from a half-mile to 125 feet of

Mountaire's spray fields and wastewater lagoons; ~~FWW member~~members of Intervenors

FWW also live and work near Mountaire's facilities. Intervenors depend on their well water's

daily utility—to bathe themselves and their children, wash their dishes, brush their teeth, clean

their produce, and, ultimately, to drink. Intervenors therefore share a fundamental interest in

clean, potable well water—water which, at a minimum, contains non-toxic levels of nitrogen

compounds.

Mountaire's conduct continues to harm that interest. Federal and state samples of

Intervenors' private wells have consistently yielded nitrate levels above the federal Maximum

Contaminant Level ("MCL")—in recent years up to *nine times* that value.[4] These readings are

consistent with Mountaire's routine exceedances of the Spray Permit's total nitrogen and annual

---

[3] Intervenors further argue—despite this Court's holding that it is ***not*** their burden under
RCRA—that neither DNREC nor the Cuppels and more that 690 "similarly situated" intervenor-
plaintiffs (collectively, "Cuppels") are adequately representing Intervenors' interests. *See*
II(A)(iii), *infra; see also Mountaire Farms* at *6 ("[Section 7002(b)(2)(E)] does not fit nicely
under ... Rule 24(a)[] ... [in part because] the burden is placed on the Administrator or State to
demonstrate that intervention is not warranted or necessary.").

[4] MCLs are health-based standards set by EPA that specify contaminants known to have adverse
effects on human health at certain concentrations. Human consumption of water containing more
than nitrate's MCL (10mg/L) may cause a variety of severe health problems, including but not
limited to methemoglobinemia ("blue baby syndrome," a potentially lethal condition that affects
infants), some forms of cancer, and autoimmune system dysfunction.

nutrient application limits, as well as Mountaire's own admission that millions of gallons of waste have leaked and continue to leak from its lagoons. Intervenors believe that the leaching of waste caused by Mountaire's over-spraying and leak-prone lagoons into the groundwater—and the migration of that groundwater downgradient to Intervenors' water wells—has contributed and is contributing to the well water nitrate contamination that threatens Intervenors' health.

This belief led Intervenors to notify DNREC and Mountaire on March 27, 2018 of their intent to sue under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B). *See* Ex. A. Intervenors claimed that Mountaire's widespread groundwater contamination threatened public health and the environment; Intervenors also alleged that Mountaire was illegally operating an "open dump."[5] *See id.* at 3.

DNREC preempted Intervenors' claims when it filed its complaint in this case. *See* D.I. 1. The complaint uses the same citizen suit provision to prosecute Mountaire for substantially the same conduct. *See id.* ¶¶ 31-36. This overlap—and the real impacts Intervenors will face should DNREC fail to secure adequate remedies—establish Intervenors' interest in the subject of this action. *See Mountaire Farms* at *6 ("Given that Intervenors and DNREC all sought to sue Mountaire under the same RCRA provision for substantially the same conduct relating to the same property, it is unclear to this Court how Intervenors could not have an interest in the subject of this action.").

**ii. Intervenors' ability to protect those interests will be adversely affected by the disposition of this action in their absence.**

---

[5] 42 U.S.C. § 6945(a). This provision is enforceable under Section 7002, 42 U.S.C. § 6972. *See id.*

Disposition of this action without Intervenors would cripple their ability to protect, remedy and enforce their interests. Now that the state action is stayed,[6] this action becomes the chief vehicle for determining Mountaire's liability—and any remedies that might flow therefrom. A negative resolution of this action could, as a practical matter, preclude Intervenors from pursuing their claims against Mountaire. This is enough to warrant intervention under RCRA. *See, e.g., Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482, 484 (S.D.N.Y. 2001) ("[S]ince a negative outcome in the instant action could preclude [intervenor] from pursuing its own interests, it was properly granted intervention under RCRA.").[7]

Resolution of DNREC's claims also threatens Intervenors' interests because those claims—and the relief they seek—improperly frame Mountaire's misconduct in terms of its recent permit violations. *See* D.I. 1 ¶¶ 11, 13 (discussing in detail only Mountaire's 2017 violations of its Spray and Sludge Permits).[8] The Decree—an agreement reached exclusively between DNREC and Mountaire and the entry of which will proceed at the conclusion of this action—is similarly framed. *See* D.I. 7, Ex. B ¶¶ 5-13, 25-27 ("[T]he Parties have agreed that … entry of this [Decree] … is the most appropriate means of resolving any outstanding matters under the Spray Permit and the [Sludge] Permits."). Specifically, the Decree focuses on the

---

[6] *See Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*, No. CV S18M-06-002 RFS, 2019 WL 1430620, at *5 (Del. Super. Ct. Mar. 29, 2019). DNREC has since filed an application for interlocutory appeal of the Superior Court's order, which the court denied. *See State of Delaware Dep't of Nat. Res. & Envtl. Control, Plaintiff, v. Mountaire Farms of Delaware, Inc., Defendant,*, 2019 WL 1949722, at *2 (Del. Super. Ct. Apr. 30, 2019).). Subsequently, DNREC filed a notice of appeal in the Delaware Supreme Court. ~~Today, the~~The Delaware Supreme Court issued an Order refusing to allow the interlocutory appeal. (Exhibit C).

[7] This Court cited *Hudson Riverkeeper* in support of the same proposition: that the Cuppels' ability to protect their interests (namely, securing more comprehensive relief than they believed the Decree offered) was practically threatened by the possibility of a negative outcome in this case. *See Mountaire Farms* at *6.

[8] Despite admitting that Mountaire's exceedances stretch back into "prior years," and that downgradient wells have "demonstrated a gradual increase in nitrate levels since at least 2011," DNREC still focuses its claims on a single year of violations. D.I. 1 ¶¶ 12, 14.

6

[Formatted: Font: 12 pt]

August 2017 "System Failure" of Mountaire's wastewater treatment facility and the permit exceedances resulting therefrom. *Id.* ¶¶ 5-13. Its solution to this specific failure is to require Mountaire, through various "Mitigation Measures," to "achieve[] results that approach full compliance" with those permits. *Id.* ¶ 62.

This myopic approach demonstrates the necessity of Intervenors' participation in this action. There is evidence that Mountaire has been violating its permit and polluting Millsboro's well water for almost two decades. *See* Ex. A at 3-10. Indeed, resolving RCRA violations requires a deeper dive into Mountaire's misconduct than a year of system failures and permit violations; Section 7002(a)(1)(B) addresses ongoing patterns of behavior—pollution and contamination that span years. Only armed with Intervenors' approach—one that comprehensively considers Mountaire's misconduct over years of operations and monitoring— can this Court award full relief to those most affected by that misconduct. Intervenors' unique position as residents closest to Mountaire's contamination makes them best equipped to assert their interests and secure lasting relief. And since this action may represent Intervenors' only opportunity to comprehensively assert those interests against Mountaire, intervention is proper.

### iii.  Intervenors are not adequately represented by DNREC or the Cuppels.

Intervenors are not adequately represented by either DNREC or the Cuppels because their interests in this action "diverge sufficiently" from Intervenors', such that neither party can devote "proper attention" to Intervenors' interests. *United States v. Territory of Virgin Islands*, 748 F.3d 514, 520 (3d Cir. 2014) (internal quotations omitted). Showing inadequate representation is DNREC's burden under RCRA. *See Mountaire Farms* at *6 ("[Section] 6972(b)(2)(E) places the burden of showing adequate representation on the State[.]"). Intervenors believe, however, that

7

demonstrating the inadequacy of the plaintiffs' representation further illustrates the threat this action poses to Intervenors' interests.

DNREC does not adequately represent Intervenors' interests. As discussed above, the agency's filings in this and the state action suggest a myopic approach that prevents this Court from granting comprehensive relief to all injured parties. Indeed, DNREC's complaint—which bases RCRA liability on a single year of permit violations and system failures—fails to capture the scope of Mountaire's misconduct. *See, e.g.*, D.I. 1 ¶¶ 11, 13. In doing so, DNREC also fails to set the stage for relief designed to remedy historical and ongoing harms to those who are most proximate to Mountaire's misconduct. This represents a divergence of interests and demonstrates why DNREC—whose claims focus on a single year of violations—cannot devote proper attention to Intervenors' interest in securing lasting relief designed to address ongoing harms. This is sufficient to show inadequate representation under Rule 24(a). *See Virgin Islands*, 748 F.3d at 520.

The Cuppels similarly fail to represent Intervenors' interests. They do not include the residents living closest to the contamination; some even live south of the Indian River, "within five miles" of the facilities. Harm to their interests might therefore be remedied by injunctive or equitable relief that could leave Intervenors' water—drawn from wells within a half-mile of the facilities—contaminated. Indeed, the simple proximity between the Facility and Intervenors' (versus the Cuppels') properties means that Intervenors and the Cuppels experience Mountaire's misconduct differently. Relief from that misconduct will also be experienced differently: any agreements in this action or modifications to the Decree made by DNREC, Mountaire and the Cuppels (who, like Intervenors, moved to intervene in the state action) will have the most immediate and lasting impact on Intervenors' interests. The Cuppels' interests "diverge

8

sufficiently" from Intervenors'; their representation in this action is therefore inadequate under Rule 24(a). *Virgin Islands*, 748 F.3d at 520.

To be sure, Intervenors' approach shares "tactical similarities" with DNREC's and the Cuppels' legal strategies. That is part of why Intervenors have established interests related to "the subject of [this] action[.]" 42 U.S.C. § 6972(b)(2)(E); Fed. R. Civ. P. 24(a)(2). But similar interests do not assure adequate representation under Rule 24. *See, e.g., Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003); *accord Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992). Even sharing the same ultimate legal objective does not render parties' interests "aligned" for purposes of "adequate representation." *Woolen v. Surtran Taxicabs, Inc.*, 684 F.2d 324, 333 (5th Cir. 1982); *see also Planned Parenthood of Minnesota, Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 870 (8th Cir. 1977). Instead, courts must compare the interests of the existing party with would-be intervenor's to determine whether the latter's interests, while not "wholly adverse," nonetheless diverge in some way from the former's. *Jansen v. City of Cincinnati*, 904 F.2d 336, 343 (6th Cir. 1990). This holds true even between would-be intervenors and *former* intervenors—like the Cuppels—whose interests might be slightly more similar to Intervenors' than DNREC's. *See, e.g., Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 913 (D.C. Cir. 1977) (finding inadequate representation because, "while the overall point of view might be shared, [intervenors' specific] interest ... may not be represented by [former intervenors]"); *Fund for Animals*, 322 F.3d at 737 ("Although there may be a partial congruence of interests, that does not guarantee the adequacy of representation.").

Here—despite the parties' mutual desire to hold Mountaire accountable for its groundwater contamination—there is substantial disagreement as to *how* to achieve that goal. Intervenors would address Millsboro's conduct comprehensively, considering years of nutrient

9

mismanagement; DNREC prefers a single-year, permit-violation approach. Further, Intervenors and the Cuppels will likely disagree on the remedies necessary to abate well water pollution within a half-mile versus five miles of the facilities. These differences are not "wholly adverse," but indicate a sufficient divergence of interests. Intervenors should therefore be allowed to protect interests partially contemplated, but not adequately represented, by the existing parties.

Finally, neither DNREC nor the Cuppels can adequately represent Intervenors because their claims under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, threaten Intervenors' RCRA claims via RCRA's "solid waste" exclusion. *See* 42 U.S.C. § 6903(27) (excluding from RCRA's definition of "solid waste"—and, through it, liability under Section 7002(a)(1)(B)—any "solid or dissolved materials in irrigation return flows … which are point sources subject to [CWA] permits").

Both parties assert that Mountaire's spraying and lagoon leaks are unlawful under CWA Section 301(a) because they constitute unpermitted discharges into "navigable waters" (the Indian River and Swan Creek) from "point source[s]" (spray field runoff and the groundwater aquifers on which the facilities sit). *See* D.I. 1 ¶ 13; D.I. 4-2 ¶¶ 51, 54; *see also* 33 U.S.C. §§ 1311(a), 1342 & 1362(12). This allegation threatens Intervenors' RCRA claims because—if this Court finds that Mountaire's discharges do reach navigable waters from a "point source"—CWA jurisdiction over those discharges would exclude them from RCRA's "solid waste" definition, forcing the dismissal of Intervenors' RCRA claims. *See* 42 U.S.C. § 6903(27).

It is true that some of Mountaire's practices fall under the CWA—namely, those fields subject to its Sludge Permits. But Intervenors' RCRA claims concern groundwater contamination caused by Mountaire's *spray* field practices, not its Sludge Permit activities. And neither DNREC nor the Cuppels present sufficient evidence of any "direct hydrological connection"

between the groundwater affected by Mountaire's spraying (or lagoon leaks) and the surface-level, "navigable waters" at issue in their complaints. *See* D.I. 1 ¶ 38 (asserting a "hydrological[] connect[ion]" once in its CWA claim); D.I. 4-2 ¶¶ 6, 59, 69-72 (offering only conclusory statements and circumstantial evidence of groundwater-surface water connection).[9] Nor does either party demonstrate (or even allege) why field runoff or leaky lagoons might qualify as "point source[s]" under the CWA. *See* D.I. 1 ¶¶ 37-39; D.I. 4-2 ¶¶ 84-86. DNREC's and the Cuppels' bare assertions of a spray-based CWA claim therefore undermine the legitimacy of Intervenors' RCRA claims and further illustrate why neither party can adequately represent Intervenors' interests in this action.

### B. Intervention is Warranted even if Intervenors Lack the Right to Intervene.

Intervenors also qualify for permissive intervention under Rule 24(b). Even if this Court finds no intervention right under Rule 24(a) and RCRA Section 7002(b)(2)(E), 42 U.S.C. § 6972(b)(2)(E), it should grant Intervenors' Motion because their claims share common questions of law and fact with the claims raised in this action. Fed. R. Civ. P. 24(b)(1)(B).[10]

Intervenors' claims match DNREC's (and the Cuppels') RCRA claims and concern substantially the same conduct by Mountaire.[11] This "presence of overlapping interests" supports the argument that Intervenors' claims "share[] a common question of law with the current

---

[9] The issue of whether point source pollution—specifically discharges that travel via groundwater before being released into an established "navigable water[]" (like a river or creek)—is "sufficiently direct" to trigger Section 301(a) coverage is currently before the Supreme Court on writ of certiorari. *See Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 139 S. Ct. 1164 (2019).

[10] Permissive intervention would not unduly delay or prejudice adjudication of the existing parties' rights for the same reasons this Motion is timely, as explained in sections II(C)(i)-(iii) below. *See* Fed. R. Civ. P. 24(b)(3). Additionally, intervention would not cause delay because Intervenors have no "unrelated new claims" to lodge. *Acra Turf Club, LLC v. Zanzuccki*, 561 F. App'x 219, 222 (3d Cir. 2014).

[11] *See* II(A)(i), *supra*.

11

action[.]" *King v. Christie*, 981 F. Supp. 2d 296, 309 (D.N.J. 2013), *aff'd sub nom. King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014). Further—since Intervenors are not adequately represented by either DNREC or the Cuppels[12]—their contributions to this action will be unique, not "superfluous." *Hoots v. Commonwealth of Pa.*, 672 F.2d 1133, 1136 (3d Cir. 1982); *see also Acra Turf*, 561 F. App'x at 222; *PA Prison Soc. v. Cortes*, 622 F.3d 215, 231-32 (3d Cir. 2010). Intervenors' participation will expedite the resolution of all claims and allow for the achievement of full relief in a single proceeding. This warrants permissive intervention under Rule 24(b).

### C. Intervenors' Motion is Timely.

The basic requirement of all Rule 24 motions is timeliness. *See* Fed. R. Civ. P. 24. A court's timeliness inquiry requires a "totality of the circumstances" exploration of three factors: (1) the stage of the proceedings at the time of filing; (2) whether the motion's delay might prejudice the existing parties; and (3) the movant's reason(s) for delay. *See Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938, 949 (3d Cir. 2012); *Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3d Cir. 2016). Intervenors' Motion is timely because this action is still in its early stages and because its delay is neither prejudicial nor unjustified.[13]

#### i. This action is still in its early stages.

---

[12] *See* II(A)(iii), *supra*.

[13] Intervenors acknowledge that motions to intervene are never perfectly timed; however, they remind this Court of the serious interests at risk should Intervenors' statutorily provided right to intervene be denied. *See id.* ("There is a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds because the would-be intervenor actually may be seriously harmed if not allowed to intervene."); *see also Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995) ("[C]ourts should be reluctant to dismiss a request for [Rule 24(a)] intervention as untimely, even though they might deny the request if the intervention were merely permissive.") (internal quotations omitted).

12

Intervenors' Motion is timely in part because this action is, procedurally, just getting started. Although it has been nearly a year since DNREC filed its complaint, "[t]he mere passage of time" does not make Intervenors' Motion untimely. *Mountain Top*, 72 F.3d at 369. Instead, "the critical inquiry" is whether "proceedings of substance on the merits" have occurred. *Id.*

Here, "a substantive decision has not yet been issued"—only a complaint and non-dispositive motion practice. *Hyland v. Harrison*, No. CIV.A. 05-162-JJF, 2006 WL 288247, at *5 (D. Del. Feb. 7, 2006) (finding intervenor's motion timely despite a "fully briefed" motion to dismiss since "no final decrees or judgments ha[d] been entered on any substantive matters"); *see also MiiCs & Partners Am., Inc. v. Toshiba Corp.*, No. CV 14-803-RGA, 2016 WL 11488672, at *3 (D. Del. June 15, 2016) (finding timely intervention after almost two years of proceedings—including some discovery and trial scheduling—since the parties had yet to complete "document production, exchange expert reports, finish fact discovery, and submit dispositive motions"); *Mountain Top*, 72 F.3d at 370 (finding timely intervention despite four years of "written discovery and settlement negotiations" since "no depositions [had been] taken, no dispositive motions filed, or decrees entered").[14] For this reason—stated best by this Court in its March 25, 2019 opinion granting the Cuppels' motion to intervene—"this case is at its earliest stages." *Mountaire Farms* at *7.

### ii. Intervention will not prejudice the existing parties.

Intervention will not prejudice the existing parties. The earliness of the proceedings is relevant here, too. *See, e.g., Mountain Top*, 72 F.3d at 370 ("[T]he stage of the proceeding is

---

[14] Courts have also allowed limited intervention after settlement. *See, e.g., Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 780 (3d Cir. 1994) (allowing intervention six and one-half months after settlement) ("This relatively short delay, in itself, leads us to the conclusion that intervention should be permitted."); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (same, approximately three years after settlement).

inherently tied to the question of prejudice[.]"). Since this Court has yet to reach a "substantive

decision," neither plaintiffs nor defendant will be forced to relitigate the merits or redo any

negotiations. *Hyland*, 2006 WL 288247 at *5 ("Given the early stage of this proceeding, the

Court is not persuaded that the [existing plaintiffs] will be prejudiced by the intervention[.]").

Intervenors' participation might prejudice the parties insofar as it forces each to consider

Intervenors' legitimate interests going forward. But this prejudice is consistent with the

"fundamental principle" that injured parties, like Intervenors, have the opportunity to redress real

harms to their interests—and is

not attributable to any time delay. *Mountain Top*, 72 F.3d at 370. For these reasons,

intervention will not cause prejudice to the existing parties.

### iii.   Intervenors had valid reasons to delay intervention.

Intervenors are justified in their delay. Intervention delays are "reason[ed]" when they

occur "promptly" after would-be intervenors "learn[] that their interests [are] in jeopardy."

*Mountain Top*, 72 F.3d at 370. This applies here because Intervenors reasonably believed that

their rights would be impacted first by the Decree, which sought to absolve Mountaire of its

RCRA liability to DNREC under Sections 7002(a)(1)(B) and 4005(a), 42 U.S.C. §§

6972(a)(1)(B) and 6945(a). Intervenors also believed, in good faith, that the purpose of

DNREC's federal complaint was procedural—to preempt Intervenors' RCRA claims in federal

court while the state action and Decree moved forward.

Pursuant to those beliefs, Intervenors focused their attention on—and moved immediately

to intervene in—the state action.[15] The moment that action was stayed, Intervenors began

---

[15] Ultimately, the Delaware Superior Court stayed the state action without ruling on Intervenors'
(or the Cuppels') motion. *See Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of*

14

preparing this Motion for submission. Since intervention delay "should be measured from the point at which the [would-be intervenor] knew, or should have known, of the risk to its rights," this Motion's delay should be measured from the Delaware Superior Court's March 29, 2019 order[16] rather than DNREC's June 4, 2018 federal complaint. *Mountain Top* at 370; D.I. 1. Given the brief delay between that order and this Motion's filing, Intervenors' Motion is timely and should be granted.

**D. Intervenors' Motion is Accompanied by a Complaint in Intervention.**

Rule 24(c) requires that motions to intervene "be accompanied by a pleading that sets out the claim … for which intervention is sought." Fed. R. Civ. P. 24(c). Intervenors therefore attach to this Motion their complaint setting forth their claims under RCRA Sections 7002(a)(1)(B) and 4005(a), 42 U.S.C. §§ 6972(a)(1)(B) and 6945(a), as well as requested relief. *See* Ex. B ("Amended Complaint in Intervention").

> Formatted: Font: 12 pt

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Intervenors respectfully request that this Court grant its Motion to Intervene.

<u>Dated: June 12, 2019</u>

JACOBS & CRUMPLAR, P.A.

> Formatted: Font: 12 pt

*/s/ ~~Thomas C. Crumplar~~Raeann Warner*

> Formatted: Font: 12 pt

Thomas C. Crumplar, Esq. (#942)
Raeann Warner, Esq. (#4931)
Patrick Gallagher, Esq. (#5170)
750 Shipyard Dr., Suite 200

---

*Delaware, Inc.*, No. CV S18M-06-002 RFS, 2019 WL 1430620, at *5 (Del. Super. Ct. Mar. 29, 2019).
[16] *Id.*

> Formatted: Font: 12 pt

15

Wilmington, DE 19801

(302) 656-5445

Tom@jcdelaw.comracann@jcdelaw.com

Of Counsel:

      NIDEL & NACE, P.L.L.C.

      Christopher T. Nidel, Esq. (to be admitted
      pro-hac vice)
      Jonathan B. Nace, Esq. (to be admitted pro
      hac vice)
      5335 Wisconsin Ave., NW
      Suite 440
      Washington, DC 20015
      202-478-9677
      chris@nidellaw.com
      jon@nidellaw.com

      Counsel for Community Plaintiffs and Food
      and Water Watch--Proposed Intervenors

      Tarah Heinzen (to be admitted pro-hac vice)
      Food & Water Watch
      1616 P Street, NW,
      Washington, DC 20036
      (202) 683-2457
      theinzen@fwwatch.org

      Attorneys for Food & Water Watch.--Proposed
      Intervenors

      Jessica Culpepper (to be admitted pro-hac vice)
      Public Justice
      1620 L Street NW, Ste 620
      Washington, DC 20006
      (202) 797-8600
jculpper@publicjusticc.net

      Attorneys for Plaintiffs.--Proposed
Intervenors

16

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STATE OF DELAWARE DEPARTMENT
OF NATURAL RESOURCES &
ENVIRONMENTAL CONTROL,

and

GARY and ANNA-MARIE CUPPELS,
individually and on behalf of others
similarly situated,

        Plaintiffs,

and

JOAN and JOSEPH BALBACK,
individually and on behalf of others
similarly situated; ~~Members of~~
FOOD and WATER WATCH,
a Washington, D.C. Non-Profit
Corporation,

      *Proposed* Plaintiffs,

      v.

MOUNTAIRE FARMS OF DELAWARE,
INC., a Delaware Corporation,

      Defendant.

Case No.: 1:18-cv-00838-MN

## AMENDED COMPLAINT IN INTERVENTION[1]

---

[1] The Original Complaint in Intervention is amended to show that Food and Water Watch is the Proposed Intervenor, and to clarify language in paragraph one. A red-lined version showing the changes from the Original Complaint in Intervention, which was attached to Proposed

~~Members of~~ Food & Water Watch ("FWW"), Joan and Joseph Balback (the

"Balbacks"), and 45 similarly situated residents and property owners (collectively, "Plaintiff-

Intervenors") bring this Complaint in Intervention (the "Complaint") seeking mandatory

injunctive relief against defendant Mountaire Farms of Delaware, Inc. ("Mountaire") for

violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"),

at its poultry processing facilities and agricultural fields (the "facilities") in Millsboro, Delaware.

**NATURE OF THIS ACTION**

~~1.    This is a citizen suit brought under Sections 7002(a)(1)(B) and~~

~~4005(a) of RCRA, 42 U.S.C. §§ 6972(a)(1)(B) and 6945(a), and required under~~

~~Federal Rule of Civil Procedure 24(c) as part of Plaintiff-Intervenors' Motion to~~

~~Intervene ("Motion") pursuant to Section 7002(b)(2)(E) of RCRA, 42 U.S.C. §~~

~~6972(b)(2)(E).~~

1.  Pursuant to 42 U.S.C. § 6972(a)(l)(B), citizens, including Plaintiff-Intervenors, are

authorized to bring suit against any person who is the "past or present generator, past or present

transporter, or past or present owner or operator of a treatment, storage or disposal facility, who

has contributed or who is contributing to the past or present handling, treatment, storage or

disposal of any solid or hazardous waste which may present an imminent and substantial threat

to human health or the environment."

2.    The purpose of this suit is to protect Millsboro residents and property owners

from well water contamination. Plaintiff-Intervenors seek mandatory injunctive relief against

Intervenors' Motion to Intervene, at D.I. 30-2, is attached as Exhibit E to the Amended Motion to

Intervene.

2

Mountaire for its past and present solid waste disposal practices at the facilities. Years of federal and state monitoring, including Mountaire's own internal monitoring and admissions, establish a traceable link between Mountaire's storage and application of wastewater (via agricultural field over-application and leak-prone lagoons) and unsafe levels of nitrate in Plaintiff-Intervenors' drinking water. Despite having knowledge of this contamination—specifically knowing that contamination exceeded its state-issued waste application permits—Mountaire persists in storing and disposing its waste in ways that imminently and substantially endanger public health and the environment.

3.      This violates RCRA. Plaintiff-Intervenors therefore seek orders declaring Mountaire's waste disposal and storage practices to be unlawful under RCRA and enjoining Mountaire from persisting in those violations, including any abatement and/or remediation necessary to end the ongoing endangerment to health and the environment. Plaintiff-Intervenors also seek attorneys' fees and costs incurred in bringing this action.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiff-Intervenors' Section 7002(a)(1)(B) claim pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a). This applies equally to Plaintiff-Intervenors' Section 4005(a) ("open dump") claim, which is enforceable under Section 7002, 42 U.S.C. § 6945(a).

5.      Alternatively, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), since both of Plaintiff-Intervenors' claims arise under RCRA.

6.      Venue is proper under Section 7002(a) of RCRA and under 28 U.S.C. § 1391(b), since Mountaire resides in this District and, alternatively, because the conduct, events, and properties giving rise to Plaintiff-Intervenors' claims are situated within this District.

3

## PARTIES

7.    Plaintiff-Intervenors are residents of Millsboro, Delaware, who live near

Mountaire's facilities and rely on well water downgradient from those facilities.

    a. Resident Plaintiff-Intervenors—47 individuals, including the Balbacks—live

       and own property 125 feet to a half-mile downgradient from Mountaire's

       facilities.

    b. FWW member Plaintiff-Intervenors also live and work downgradient from the

       facilities. FWW is a national, non-profit membership organization dedicated

       to healthy food and clean water for all. Pollution from industrial agriculture is

       one of FWW's priority issues, and FWW is engaged in several campaigns to

       reduce nutrient pollution nationally through stronger agricultural regulation,

       transparency, and enforcement. FWW and its active members, which include

       FWW member Resident Plaintiff-Intervenors, share a strong interest in

       securing clean drinking water for communities near large-scale agricultural

       operations.

8.    Plaintiff State of Delaware, Department of Natural Resources and Environmental

Control ("DNREC") is an administrative agency of the State of Delaware established by Chapter

80 of Title 29 of the Delaware Code. DNREC is legislatively authorized to exercise the police

power of the State of Delaware "in order to protect the health, safety, and welfare" of Delaware

citizens. D.I. ¶¶ 1-3.

9.    Plaintiff-Intervenors Gary and Anna-Marie Cuppels, and more than 690

individuals similarly situated (the "Cuppels"), are Millsboro residents who reside "within five

4

miles" of the facilities. D.I. 4-2 ¶ 1. The Cuppels "live on or regularly boat, fish, or otherwise

pursue recreational activities" on the Indian River and its tributaries. *Id.*

      10.    Defendant Mountaire is a corporation organized and operating under the laws of

the State of Delaware, with its principle place of business located at 29005 John J. Williams

Highway, Millsboro, Delaware 19966. The facilities are also located at that address.

## FACTUAL BACKGROUND

      11.    Mountaire acquired ownership of the facilities in 2000. It has been solely

responsible for the facilities' operations since that time.

      12.    The facilities include a poultry processing plant, wastewater treatment facilities,

approximately 928 acres of agricultural fields permitted for spray irrigation (the "spray fields"),

and two anaerobic lagoons in addition to a spray irrigation lagoon used for waste storage (the

"lagoons"). The lagoons have a combined wastewater storage capacity of 35.83 million gallons.

      13.    Mountaire slaughters approximately 2 million chickens at its processing plant

each week. This produces roughly 2.4 million gallons of waste per day. The waste produced

includes feathers, dirt, fecal matter, blood, slaughtering wastewater, carcass parts, grit, sand,

gravel, flesh, fat, grease, chiller wastewater, processing wastewater, cleanup wastewater, and

sanitary waste from Mountaire's employees.

      14.    Mountaire disposes part of that waste onto its spray fields pursuant to a State of

Delaware Spray Irrigation Operations Permit (No. 359191-04) (the "Spray Permit"). The rest is

stored for treatment and future field application in Mountaire's lagoons.

      15.    The Spray Permit allows Mountaire an annual application rate of 320 lbs/acre of

nitrogen and a monthly total nitrogen concentration ("TNC") of 15.6 mg/L. The application rate

is a measure of how much nitrogen Mountaire applies to its spray fields each year; the TNC is a post-treatment measure of the amount of nitrogen in Mountaire's waste.

16.     Mountaire has applied, currently does apply, and is reasonably likely to continue to annually apply waste onto its spray fields in amounts that exceed the 320 lbs/acre allowed under the Spray Permit. DNREC inspection reports from 2015 to the present show that Mountaire regularly applied nutrients to its spray fields in excess of its 320 lbs/acre annual application rate. For example, in 2017, Mountaire exceeded its annual application rate on 11 of its 13 spray fields; six of those fields exceeded the annual rate in August alone.

17.     Mountaire has routinely applied and will likely continue to apply effluent waste with TNCs above the Spray Permit's 15.6mg/L limit. DNREC inspection reports from 2015 to the present confirm TNCs consistently in excess of that limit. These levels are frequently extreme, regularly reaching above 100 mg/L. In September of 2017, for example, Mountaire's effluent TNC reached 641 mg/L—forty times the Spray Permit's limit.

18.     Mountaire has also admitted that its lagoons suffer a leakage rate of $10^7$ cm/s. This suggests that potentially hundreds of gallons of treated and untreated waste escapes from Mountaire's lagoons and into the surrounding soil every day.

19.     Nutrient pollution from spray fields and leak-prone lagoons is a common feature of large-scale agricultural operations. It can occur when excess chemicals like nitrogen (including nitrogen compounds such as nitrate) leach through the soil and into groundwater.

20.     Nitrate acts as a fertilizer; however, crops can only absorb it in limited amounts. When applied at levels that exceed a crop's fertilization needs (the "agronomic rate"), excess nitrate accumulates in the soil. This can leach into surrounding groundwater.

21.     Nitrate is considered a "contaminant" by the Environmental Protection Agency ("EPA") pursuant to its authority under the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.* ("SDWA"), because the agency determined that its presence in drinking water "may have an adverse affect" on human health. 42 U.S.C. § 300g-1(b)(1)(A). EPA set the maximum "permissible" drinking water concentration for nitrate at 10 mg/L (the "maximum contaminant level" or "MCL"). 42 U.S.C. § 300f(3); 40 C.F.R. § 141.62(b)(7).

22.     EPA arrived at 10 mg/L in part because it found that "[i]nfants below the age of six months who drink water containing nitrate in excess of the MCL could become seriously ill"—contracting blood disorders like methemoglobinemia ("blue-baby syndrome")—"and, if untreated, may die."[2] Indeed, consumption of water high in nitrates enhances the risk of severe health problems for people of all ages—including (but not limited to) birth defects, a variety of cancers, and autoimmune system dysfunction. Pregnant women and fetuses are particularly vulnerable to the negative health effects of chronic nitrate exposure.

23.     Mountaire's facilities are located on two major aquifers (bodies of permeable rock that contain and transmit groundwater): the Columbia Surficial aquifer and the Chesapeake aquifer. Both supply drinking water to Plaintiff-Intervenors' water wells.

24.     Water samples taken by EPA and DNREC from wells downgradient of Mountaire's facilities have consistently yielded nitrate concentrations above the 10 mg/L MCL. Since 2010, for example, DNREC has documented elevated and rising nitrate levels—far above the 10 mg/L MCL—in wells downgradient from Mountaire's facilities.

---

[2] EPA, National Primary Drinking Water Regulations: Inorganic Chemicals: Nitrate, *available at* https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations#Inorganic (last visited May 2, 2019).

7

25.     Seven wells downgradient from Mountaire's facilities have tested above 10 mg/L every year from 2003 to 2017. In 2016, downgradient groundwater monitoring yielded concentrations as high as 92.5 mg/L; in 2017, nitrate concentrations reached as high as 65.8 mg/L.

26.     These results are significantly higher than five-year average concentrations from two wells *upgradient* of Mountaire's facilities. Those yielded average concentrations of 5.75 mg/L and 6.42 mg/L, respectively, with neither well yielding results above the 10 mg/L MCL.

27.     Plaintiff-Intervenors rely on well water downgradient from Mountaire's facilities. They use the water from their wells multiple times each day—to bathe themselves and their children, wash their dishes, clean their produce, and to drink.

28.     Mountaire's operational practices at the facilities have caused and are causing ongoing harm to the groundwater in the Columbia Surficial and Chesapeake aquifers. In addition to spraying and negligently storing waste that exceeds the Spray Permit's 15.6 mg/L TNC, Mountaire routinely applies that waste in excess of its 320 lbs/acre annual application rate.

29.     The resultant leaching of treated and untreated waste from Mountaire's over-sprayed fields and leak-prone lagoons has contributed and is contributing to nitrate levels that exceed the MCL in Plaintiff-Intervenors' water wells.

## PROCEDURAL HISTORY

30.     In 2002—two years after Mountaire assumed control of the facilities—EPA determined that Mountaire had contaminated the wells beneath and downgradient from its facilities, in violation of the SDWA. EPA found that the wells' routine sampling above the nitrate MCL presented an imminent and substantial endangerment to public health.

8

31.     EPA entered into a consent decree and order with Mountaire in 2003 (the "2003 Order"). That agreement was based on EPA's conclusion that "poultry operations at the [facilities] have impacted the nitrate levels in the ground water used as a source of drinking water and therefore caused or contributed to the contamination of the [groundwater] underlying the [facilities]." The 2003 Order identified at least ten residences downgradient from the facilities whose wells contained water with nitrate concentrations above the MCL. Mountaire agreed, *inter alia*, to provide emergency alternative drinking water to residences whose wells were contaminated and to remediate the facilities' groundwater in order to reduce the nitrate levels below the MCL.

32.     On July 21, 2005, Mountaire submitted a request to EPA to terminate the 2003 Order. EPA rejected Mountaire's request; it determined that Mountaire had failed to "maintain point of use treatment devices on the residences identified" in the 2003 Order. In fact, of the ten identified residences with nitrate-contaminated water, Mountaire had maintained point of use treatment devices at only a single residence.

33.     Mountaire's violations of the 2003 Order continued, eventually causing DNREC to intervene. On September 7, 2010—a year after DNREC issued Mountaire the Spray Permit—the agency's Groundwater Discharges division sent Mountaire a notice of non-compliance ("2010 Notice") as a result of nitrate concentrations in numerous monitoring wells exceeding the Spray Permit's TNC.

34.     According to the 2010 Notice, monitoring wells in and downgradient from Mountaire's facilities had consistently shown average nitrate concentrations of 25 mg/L.

9

35.     Mountaire proposed a number of wastewater treatment upgrades in response to the 2010 Notice. These were designed to achieve an effluent TNC beneath 15.6 mg/L, in compliance with Mountaire's Spray Permit.

36.     Ultimately, these upgrades did not solve the problem. In fact, at the end of August 2017, Mountaire discovered that its wastewater treatment facility ("WWTF") "was in failure" due to a buildup of solids throughout the WWTF and a depletion of oxygen in the aerobic portions of the WWTF (the "2017 System Failure"). D.I. 7, Ex. B ¶ 5.

37.     These failures resulted in Mountaire's effluent waste TNCs exceeding the 15.6 mg/L allowed under the Spray Permit.

38.     Because of ongoing violations of the Spray Permit's TNC, DNREC issued Mountaire's 2017 Spray Permit renewal with a Schedule of Compliance (the "Schedule"). The Schedule required Mountaire to submit a "Corrective Action Work Plan" by August 31, 2017, addressing the TNC exceedances. D.I. 7, Ex. B ¶ 10.

39.     Mountaire's failed to submit a Corrective Action Work Plan. Due to this failure and the persistent violations of the Spray Permit's conditions, DNREC issued a second notice of violation in November 2017 (the "2017 NOV"), which outlined the following violations:

     a. Since 2010, Mountaire's effluent TNCs have routinely been above 100 mg/L.

     b. TNCs have consistently exceeded the Spray Permit's 15.6 mg/L since 2015, reaching as high as 76.75 mg/mL in April 2017 and 641 mg/L in 2017.

     c. On September 5, 2017, DNREC received a notice that Mountaire was collecting effluent composite samples from an invalid sampling point.

     d. On August 31, 2017, grab samples collected at spray pivots (i.e., from wastewater outputs used to apply waste to Mountaire's spray fields) showed

10

Fecal Coliform levels exceeding 1,000,000 col/100mL. The same samples showed total chlorine residual at 0.2 mg/L, well beneath the 1.0 mg/mL minimum set out in Mountaire's Spray Permit.

e. On September 7, 2017, Mountaire notified DNREC that not all flow from its clarifiers discharged into the storage lagoon, but instead some raw waste was being pumped directly into central pivots and then applied onto Mountaire's spray fields.

f. Mountaire's treated wastewater routinely exceeded the daily permissible average concentration of Biochemical Oxygen Demand (BOD5), 50 mg/L. From 2015 through 2017, Mountaire violated this standard 29 times, with daily average BOD5 levels reaching as high as 1200 mg/L, or twenty-four times the permissible concentration.

g. Mountaire's treated wastewater routinely exceeded the daily permissible average concentration of Total Suspended Solids (TSS), 50 mg/L. In 2016 and 2017, Mountaire violated this standard twenty-four times, with daily average TSS concentrations reaching as high as 4220 mg/L, or over eighty-four times the permissible concentration.

h. Mountaire's treated wastewater routinely exceeded the daily permissible average concentration of Fecal Coliform, 200 col/100mL. In 2017, Mountaire violated this standard nine times, with daily average Fecal Coliform concentrations reaching as high as 1,100,000 mg/L, or 5,500 times the permissible concentration.

11

i. Mountaire's treated wastewater routinely failed to maintain a Total Chlorine

Residual between 1.0 mg/L, and 4.0mg/L. In 2017, Mountaire failed to report

Total Chlorine Residual values in their July and August reports. Nonetheless,

Mountaire's treated wastewater contained less than 1.0 mg/L residual chlorine

sixteen times in September alone.

40.     DNREC concluded that that the "interim measures" implemented by Mountaire

after the 2017 System Failure "have not and cannot consistently achieve full compliance with the

Spray Permit" until Mountaire achieved long-term upgrades to the WWTF. D.I. 7, Ex. B ¶ 16.

41.     DNREC also concluded that Mountaire's wastewater treatment facility and spray

irrigation system had caused groundwater to exceed the MCL for nitrate, with levels reaching as

high as 92.5 mg/L in 2016 and 65.8 mg/L in 2017.

42.     Mountaire has repeatedly failed to notify DNREC of its noncompliance. Despite

Total Nitrate concentrations having exceeded permitted levels since 2015, Mountaire failed to

notify DNREC until September 20, 2017.

43.     Mountaire also failed to notify DNREC that not all effluent from its wastewater

treatment plant was flowing into its lagoons. Instead, untreated wastes had bypassed the lagoons

and were being sprayed directly onto Mountaire's spray fields. Mountaire notified DNREC only

after the agency sent a letter on September 15, 2017, requiring Mountaire to do so.

44.     Mountaire's substantive and procedural violations of the Spray Permit are

ongoing. Its waste storage and application practices continue to overload the facilities' fields

with nitrate and other harmful contaminants, preventing Millsboro's aquifers—and the wells they

supply—from providing Plaintiff-Intervenors with safe drinking water.

45.     For this reason, Plaintiff-Intervenors sent Mountaire, DNREC and EPA notice[3] of their intent to sue on March 27, 2018 (the "NOI"), pursuant to subsection (b)(2)(A) of RCRA's citizen suit provision, 42 U.S.C. § 6972. The NOI detailed Mountaire's Spray Permit noncompliance (discussing sampling results from Mountaire's spray fields and from wells in and around the facilities) and informed Mountaire of Plaintiff-Intervenors' intent to bring two separate claims under RCRA—an "endangerment" claim and an "open dump" claim, 42 U.S.C. §§ 6972(a)(1)(B) and 6945(a), respectively. *See* Ex. A at 3-10.

46.     On May 2, 2018, the Cuppels sent a separate notice of their intent to sue Mountaire. They alleged the same two RCRA claims as Plaintiff-Intervenors, in addition to a claim under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) ("CWA"). *See* D.I. 4-3 at pp. 4-16 of 83.

47.     Section 7002(b)(2)(A) of RCRA required that Plaintiff-Intervenors and the Cuppels wait 90 days after the receipt of their notices to bring their RCRA claims against Mountaire. 42 U.S.C. § 6972(b)(2)(A).

48.     On June 4, 2018, DNREC simultaneously filed a verified complaint in this Court (the "federal action") and a complaint in Delaware Superior Court (the "state action"). DNREC's federal action alleged the same two claims Plaintiff-Intervenors and the Cuppels intended to bring under RCRA, as well as the CWA claim the Cuppels had alleged in their notice letter. *See* D.I. 1 ¶¶ 31-39. DNREC alleged 15 claims in the state action (various permit, monitoring, and notice violations) pursuant to its enforcement authority under Section 6005 of the State of Delaware Code, 7 Del. Code Ann. § 6005.

---

[3] Attached to Plaintiff-Intervenors' Motion as Exhibit A.

13

49.     The same day DNREC filed its complaints, it also entered into a Consent Decree (the "Decree") with Mountaire. The Decree focuses on the 2017 System Failure at Mountaire's facilities and seeks to moot Mountaire's liability to DNREC under RCRA and the CWA, provided that Mountaire implement various "Mitigation Measures." D.I. 7, Ex. B ¶¶ 5-13, 25-27, 62. Both parties submitted the Decree for approval in Delaware Superior Court.

50.     DNREC's federal action was filed 69 days after Plaintiff-Intervenors' NOI and 33 days after the Cuppels' notice of intent to sue—before Plaintiff-Intervenors or the Cuppels could bring their claims under RCRA and before the Cuppels could bring their CWA claim. *See* 42 U.S.C. § 6972(b)(2)(A); 33 U.S.C. § 1365(b)(1)(A).

51.     Plaintiff-Intervenors were therefore precluded from bringing their RCRA claims when DNREC filed its verified complaint in the Court on June 4, 2018. *See* 42 U.S.C. § 6972(b)(2)(C)(i).

52.     Plaintiff-Intervenors moved to intervene in the state action on June 8, 2018, three days after the Cuppels also moved to intervene in that action.

53.     The Cuppels moved to intervene in this action on June 29, 2018. That motion was granted by this Court on March 25, 2019. *Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*, No. CV 18-838 (MN), 2019 WL 1333266, at *7 (D. Del. Mar. 25, 2019).

54.     Four days later—without ruling on Plaintiff-Intervenors' or the Cuppels' motions to intervene or approving the Decree—the Delaware Superior Court stayed the state action. *See Dep't of Nat. Res. & Envtl. Control v. Mountaire Farms of Delaware, Inc.*, No. CV S18M-06-002 RFS, 2019 WL 1430620, at *5 (Del. Super. Ct. Mar. 29, 2019). It cited concerns with DNREC's raising RCRA and CWA issues in its complaint and the Decree's partial mooting of

14

Mountaire's liability under both federal statutes—despite all 15 of DNREC's claims arising under state law.[4] *Id.* The court concluded that "[t]he resolution of the [federal action]" before the state action or Decree were allowed to proceed "will allow for the RCRA and CWA issues to be addressed and resolved rather than foreclosed" to Plaintiff-Intervenors and the Cuppels. *Id.*

55.     This Complaint is attached as part of Plaintiff-Intervenors' Motion pursuant to Section 7002(b)(2)(E) of RCRA, 42 U.S.C. § 6972(b)(2)(E), and in accordance with Federal Rule of Civil Procedure 24(c). Plaintiff-Intervenors submit this Complaint in order to "set[] out the claim[s] … for which intervention is sought." Fed. R. Civ. P. 24(c).

## COUNT I

### VIOLATION OF RCRA – Endangerment to Health or the Environment

56.     Plaintiff-Intervenors adopt and incorporate the preceding paragraphs by reference.

57.     Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), authorizes "any person" to bring suit against a past or present generator, transporter, or owner or operator of a "treatment, storage, or disposal facility" who has contributed or is contributing to the "past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

58.     Plaintiff-Intervenors are "person[s]" under Section 7002(a)(1)(B) because they are a group of individuals. 42 U.S.C. § 6903(15).

59.     Mountaire is a generator, transporter, and owner and/or operator of the facilities— which include waste treatment, storage, and disposal operations—and is contributing to the past and present "storage, treatment, transportation and/or disposal" of solid wastes.

---

[4] Specifically, the court was unsettled by DNREC's "rubber stamp" request—that the court should "defer" to DNREC and approve the Decree "without any review." *Id.* at *4.

15

60.    Mountaire's wastewater constitutes "solid waste" under RCRA because it includes "any … discarded material, including solid, liquid, semisolid … material resulting from industrial, commercial … and agricultural operations[.]" 42 U.S.C. § 6903(27).

61.    Mountaire's operations involve solid waste "disposal" because they "discharge, deposit, inject[], dump[], spill[] … or leak[]" poultry and sanitary wastewater onto "land or water so that such solid waste … or any constituent thereof may [be] … discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

62.    Mountaire's routine and ongoing storage, treatment, transportation, and disposal of poultry and sanitary wastewater—solid wastes that exceed the Spray Permit's TNC and are applied in excess of its annual application rate—is traceable to nitrate MCL exceedances in Plaintiff-Intervenors' downgradient well water. Plaintiff-Intervenors rely on this water for drinking, bathing, and otherwise consuming. Mountaire's practices therefore present an imminent and substantial endangerment to the health of nearby residents and are unlawful under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

## COUNT II

## VIOLATION OF RCRA – Open Dumping

63.    Plaintiff-Intervenors adopt and incorporate the preceding paragraphs by reference.

64.    Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), prohibits the operation of "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste." Enforcement of this prohibition is available through RCRA's citizen suit provision, 42 U.S.C. § 6972. 42 U.S.C. § 6945(a).

16

65.     "Disposal" means any "discharge, deposit, injection, dumping, spilling … or

leaking" of solid waste onto "land or water so that such solid waste … or any constituent thereof

may [be] … discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

66.     EPA has promulgated criteria under Section 1008(a)(3) of RCRA, 42 U.S.C. §

6907(a)(3), defining solid waste management practices which constitute "open dumping." 40

C.F.R. Pts. 257-58. These criteria define "open dumping" as solid waste management practices

which "contaminate" an "underground drinking water source" located beyond the "solid waste

boundary" of the disposal site. 40 C.F.R. § 257.3-4(a).

67.     "Contaminate" means to introduce a substance that would cause (i) the

concentration of that substance in the groundwater to exceed its MCL or (ii) an increase in the

concentration of that substance in the groundwater where the existing concentration of that

substance exceeds its MCL. 40 C.F.R. § 257.3-4(c)(2).

68.     "[U]nderground drinking water source" includes aquifers supplying drinking

water for human consumption. 40 C.F.R. § 257.3-4(c)(4)(i).

69.     "Solid waste boundary" means the solid waste's "outermost perimeter … as it

would exist at completion of the disposal activity." 40 C.F.R. § 257.3-4(c)(5).

70.     Groundwater samples taken by the EPA and DNREC from wells downgradient of

Mountaire's facilities have consistently yielded nitrate concentrations in excess of the MCL. 40

C.F.R. § Pt. 257, App. I.

71.     Mountaire's past and present waste disposal practices at the facilities have caused

nitrate to travel downgradient—beyond the facility's solid waste boundaries—and contaminate

Plaintiff-Intervenors' underground drinking water sources. This constitutes "open dumping"

under RCRA and violates Section 4005(a), 42 U.S.C. § 6945(a).

17

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Intervenors respectfully request that this Court provide them with the following relief:

A. Allow Plaintiff-Intervenors to intervene and fully participate as Plaintiffs in the present action;

B. Declare Mountaire to be in violation of RCRA;

C. Enter a preliminary and permanent injunction prohibiting Mountaire from engaging in solid waste storage and disposal practices that imminently and substantially endanger health or the environment;

D. Enter a preliminary and permanent injunction prohibiting Mountaire from engaging in solid waste storage and disposal practices that constitute "open dumping";

E. Order Mountaire to provide Plaintiff-Intervenors with an alternative water supply until their well water's nitrate concentration consistently registers below the MCL, at no cost to Plaintiff-Intervenors;

F. Order Mountaire to upgrade and modify its solid waste treatment, storage and disposal operations in order to achieve ongoing compliance with any permits, laws, regulations, or industry standards that might apply thereto;

G. Order Mountaire to remediate the contaminated groundwater and Plaintiff-Intervenors' well water in order to remedy past, current, and ongoing negative health and environmental impacts;

H. Award Plaintiff-Intervenors the costs and expenses of this action, including all attorneys' fees; and

I.   Award such further relief as this Court deems just and proper.

Dated: ~~May 28~~June 12, 2019                     Respectfully submitted,

JACOBS & CRUMPLAR, P.A.

/s/ Raeann Warner
Raeann Warner, Esq. (#4931)
Thomas C. Crumplar, Esq. (#942)
Patrick Gallagher, Esq. (#5170)
750 Shipyard Dr., Suite 200
Wilmington, DE 19801
(302) 656-5445
Raeann@jcdelaw.com

Of Counsel:

NIDEL & NACE, P.L.L.C.

Christopher T. Nidel, Esq. (to be admitted
pro-hac vice)
Jonathan B. Nace, Esq. (to be admitted pro
hac vice)
5335 Wisconsin Ave., NW
Suite 440
Washington, DC 20015
202-478-9677
chris@nidellaw.com
jon@nidellaw.com

Counsel for Community Plaintiffs and Food
and Water Watch

19

Tarah Heinzen (to be admitted pro-hac vice)
Food & Water Watch
1616 P Street, NW,
Washington, DC 20036
(202) 683-2457
theinzen@fwwatch.org

**Attorneys for Food & Water Watch**

Jessica Culpepper (to be admitted pro-hac vice)
Public Justice
1620 L Street NW, Ste 620
Washington, DC 20006
(202) 797-8600
jculpper@publicjustice.net

**Attorneys for Plaintiffs**

20