**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| DEPARTMENT OF NATURAL | ) | |
| RESOURCES & | ) | Case No.: 1:18-cv-00838-MN-JLH |
| ENVIRONMENTAL CONTROL | ) | |
| Plaintiff, | ) | |
| | ) | |
| GARY and ANNA-MARIE CUPPELS, | ) | |
| et al. | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOUNTAIRE FARMS OF | ) | |
| DELAWARE, INC., | ) | |
| a Delaware Corporation, | ) | |
| Defendant. | ) | |

**INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

Gary and Anna-Marie Cuppels, on behalf of more than 800 other residents and property

owners ("Intervenors") in the vicinity of the Millsboro, Delaware property and facilities owned

and operated by, among others, Mountaire Farms of Delaware, Inc. ("Mountaire"), submit this

Memorandum of Law in Support of their Motion for Preliminary Injunction.

In the 20 years since its acquisition of the Millsboro plant, Mountaire has regularly

discharged approximately 2 million gallons a day of nitrogen-laden wastewater from spray

irrigation devices onto 950 acres of nearby fields, adjacent to Intervenors' residences, Swan Creek,

and Indian River. The excessive nitrogen content of the wastewater becomes nitrate after

application to soil as it percolates into and contaminates the groundwater. The nitrates cause or

contribute to the contamination of Intervenors' wells and the surface waters adjoining the plant.

Intervenors have filed a citizen suit complaint seeking to enjoin Mountaire's ongoing

violations of the Clean Water Act ("CWA"), 33 U.S.C. §1251, *et seq*, and the Resource

Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 *et seq.* On April 23, 2020, the Supreme Court of the United States determined that Clean Water Act permit jurisdiction extends to point source discharges that are "functionally equivalent" to a direct discharge to navigable waters. *County of Maui, Hawaii v. Hawaii Wildlife Fund*, No. 18-260, 2020 WL 1941966 (U.S. April 23, 2020). Mountaire's spraying of nitrogen-laden wastewater from irrigation devices onto fields *adjoining* navigable waters is functionally equivalent to a discharge of pollutants directly to these waters without a permit, in violation of the CWA, 33 U.S.C. §1342. Mountaire's ongoing disposal of nitrogen-laden wastewater to groundwater also causes or contributes to the groundwater's current elevated nitrate levels that may present an imminent and substantial endangerment to health or the environment in violation of RCRA, 42 U.S.C. §6972(a)(1)(B) and constitutes Open Dumping, in violation of RCRA, 42 U.S.C. §6945(a).

Under the lodged Agreement and [Proposed] Consent Decree ("Proposed CD") (D.I. 65), excessive nitrogen-laden wastewater will continue to be discharged for the next 3–5 years until Mountaire's wastewater treatment plant is upgraded. The Proposed CD does *nothing* to address Mountaire's failure to obtain a CWA discharge permit that would protect adjoining surface waters or its ongoing endangerment of public health and the environment and open dumping of waste. For these reasons, Intervenors seek a preliminary injunction.

## BACKGROUND

Mountaire knew when it acquired its Millsboro plant that the groundwater near the processing plant and irrigation spray fields was contaminated with nitrates at levels exceeding the Federal and Delaware Drinking Water Standard of ten parts per million (ppm).[1] Nevertheless, Mountaire increased the plant's production by nearly 50% while failing to invest in the wastewater

---

[1] The 10-ppm standard is the same as 10 milligrams per liter or mg/l.

treatment system upgrades and expansion necessary to accommodate its increased production. *See* Ex. A, Kenneth Norcross Aff. ('Norcross Aff.") ¶2c, and Letter ("Norcross Letter") at 2-3. As a result, Mountaire has consistently violated its wastewater spray irrigation and sludge disposal permits, disregarded enforcement findings, and negligently operated its wastewater treatment system, causing or contributing to widespread groundwater contamination in the Millsboro area.

More than 2,500 nearby residents rely on the groundwater for drinking water and other potable uses such as showering, bathing, brushing teeth and swimming pools. According to Dr. Catherine Zeman, a university professor and nitrate health expert, consuming water with a nitrate concentration of 5 ppm or greater creates a significant, elevated risk of several cancers and other chronic health conditions affecting the cardiovascular, digestive, genetic, hematopoietic/lymphatic, hormonal, immune, musculoskeletal, nervous, urinary and reproductive systems of the human body. *See* Ex B, Dr. Catherine Zeman Aff. ("Zeman Aff.") ¶6 and Report "Nitrate: Environmental and Human Health Implications, a Review of the Acute and Chronic Health Concerns." There are an estimated 950 residential wells that exceed this 5-ppm threshold downgradient of Mountaire's spray irrigation and sludge fields. *See* Ex. C, Dr. Harvey A. Cohen Aff. ("Cohen Aff.") at 4, ¶J and Supplemental Report ("Cohen Report") at 4-5 and Figs 1, 2, 3.

### Mountaire's History of Continuous Violations

Mountaire's reported data show that its wastewater effluent has exceeded the current permit limit of 15.6 ppm total nitrogen since Mountaire began operating the plant in 2000; in most years by at least twice that level and some years by up to five times the limit. *See* Ex. A, Norcross Aff, ¶2a and Norcross Letter at 2-4. Through 2019, Mountaire exceeded its allowable application of 320 lbs. of nitrogen per acre per year by more than *one million* pounds. *See* Ex. D, Dane Bauer Aff. ("Bauer Aff") at ¶3A and letter report ("Bauer Report") at 17 and its App 2 .

Beginning in 2010, DNREC required Mountaire to measure the nitrate concentration in the saturated soils beneath the crop root uptake zone in the fields where Mountaire sprayed. *See* Ex C, Cohen Report at 8. The data generated are very damning. These readings reveal the level of nitrogen remaining in Mountaire's spray irrigation wastewater after it percolates through the soil, following plant uptake, but just before it reaches the groundwater. *Id.*; *see also* Fig. 7. The data collected from 2011 through 2019 clearly demonstrate that Mountaire's percolate consistently exceeds the nitrate drinking water standard on an annual average basis by a multiple of three to more than five times. *Id.*; *see also* Figs. 8 and 9. This percolate, which also finds its way to the adjoining surface water in Swan Creek and the Indian River, has caused and contributed to exceedances of the surface water quality criterion nitrogen compounds for lower Swan Creek and Indian River in 85% of the samples collected by DNREC between 2000-2019. *Id.* at 6. There can be no doubt that the contamination in these percolate samples is solely attributable to Mountaire.

Mountaire has ignored the purpose of land application of its partially treated wastewater: to achieve further treatment of its wastewater through crop uptake of nitrogen. After crop uptake, concentrations should be low enough that the wastewater that seeps into soils below the crop root zone does not cause or contribute to groundwater contamination with nitrates above the 10-ppm federal drinking water standard. For Mountaire, land application of its wastewater by spray irrigation is a ruse for *disposal* of its waste.

 Drone video taken over the past two years—including as recent as March 2020—shows that Mountaire continues to spray its partially treated effluent containing excessive nitrogen on fields that contain standing water, runoff, and that are barren or have crops that are dormant. *See* Ex D, Bauer Report at 3-16. Under these conditions, there is little or no crop "uptake" to remove nitrogen from the wastewater and the ponded wastewater runs off to adjacent waterways. *Id.* at 10,

12-13. According to Mr. Bauer, an expert in spray irrigation of wastewater, Mountaire's lack of adequate effluent storage capacity at its treatment plant—currently only enough to hold six days of production wastewater compared to the industry standard of 60-90 days or more in the Mid-Atlantic region—forces Mountaire to spray its partially treated wastewater during inappropriate conditions prohibited by its permit when the wastewater should be held in storage. *Id.* at 21-22.

### 2017 Catastrophic Failure of Mountaire's Wastewater Treatment Plant

From at least August through October 2017, Mountaire experienced a catastrophic wastewater treatment failure at the Millsboro plant because of human error and equipment malfunction. Mountaire had more than 100 permit violations, including "treated" wastewater levels that exceeded its permit limit by up to 41 times and led to loading six of nine spray fields with as much as three times or more the allowable annual amount of nitrogen by August. *See* Ex. E, Nov. 2, 2017 DNREC  Notice of Violation ("2017 NOV") at 4-6. In 2018, Mountaire exceeded its permit limit of 15.6 ppm for total nitrogen on average by a factor of five times the limit and effluent sprayed on fields impacting Intervenors' wells continues today to exceed the permit limit by at least 100 percent on average. *See* Ex. A, Norcross Letter at 4.

In May 2017, only three months before the catastrophic treatment plant failure, Mountaire applied to DNREC seeking approval to expand its poultry production by another 18 percent. *See* Ex. F, App. for Coastal Zone Act Permit at 5. Mountaire's President and CEO signed the application and certified it as true under penalty of perjury. *Id.* at Part I. He pledged that if there were a major mechanical malfunction or human error causing a change in its wastewater discharge that continued and could not be contained by the storage at the plant "live haul operations at the plant will be interrupted and the processing plant shut down." *Id.* at 22. Following the catastrophic failure of Mountaire's wastewater treatment plant starting in August 2017, live haul operations

were not interrupted as promised. The plant continues to operate with no reduction in the volume of wastewater sprayed year-round, despite ongoing gross permit exceedances for total nitrogen that pollute the groundwater, Intervenors' wells, and adjacent sensitive waterways.

### Mountaire's Contamination of Groundwater and Intervenors' Wells

The extent and severity of groundwater contamination continues to grow. Dozens of residential wells tested for nitrates downgradient of Mountaire's waste disposal facilities exceed the 10-ppm drinking water standard, and hundreds more are in areas where nitrate levels in the groundwater exceed the elevated health risk level of 5 ppm and are approaching 10 ppm. *See* Ex C. Cohen Aff. at 4, ¶ J. Nevertheless, the Proposed CD ignores the vast majority of Intervenors with elevated nitrate levels in their wells.[2]

### Mountaire's Contamination of Adjoining Surface Waters

The Delaware Inland Bays, including Indian River and Swan Creek, which adjoin Mountaire's wastewater treatment plant and spray fields, are estuaries of national significance under the National Estuary Program. *See* Ex I, "Findings & Recommendations of the Mountaire Pollution Committee," Delaware Center for the Inland Bays ("CIB") at 5. The nitrogen concentration in the Indian River near its confluence with Swan Creek and the Mountaire facility is more than twice the healthy level. *Id.* Pollution in these sensitive waterways has been increasing, and the CIB has found that the excessive discharge of nitrogen from Mountaire's spray irrigation

---

[2] The Proposed CD requires Mountaire to offer drinking water treatment to only 10 percent of the homes (those in the "Residential Area") that currently are or will be impacted by Mountaire's groundwater contamination. *Id.*; *see also* DI 63 ¶¶45-49 and its Ex. G. The remaining 90 percent of affected homes not in the "Residential Area" will suffer through buying and drinking bottled water—while bathing with contaminated well water—indefinitely. *See* Ex. G, Ronald Tolson Decl. ¶1 and Ex. H, Christine Caliguire Decl. ¶11.

facilities is a significant contributor to the degradation of Indian River and Swan Creek. *Id.*[3]
Intervenors use these waterways for sustenance and recreation. *See* Ex. J, Gary Cuppels Decl. ¶5.

Samples collected in Swan Creek over many years demonstrate Mountaire's significant
negative effect on the groundwater discharging into the Creek. Nitrate levels in this waterway
immediately downstream of Mountaire's spray and sludge fields are two to three times higher than
upstream locations not subject to Mountaire's pollution. *See* Ex C, Cohen Report at 6 and its Figs.
4-6. Mountaire's excessive "disposal" of nitrogen-laden waste to the groundwater is contributing
more than 5,600 pounds of nitrate per year to the upper portion of this small stream. *Id.*

### Inadequate DNREC Agreement

DNREC sued Mountaire in this Court two years ago alleging that Mountaire was violating
the CWA and RCRA by spraying wastewater onto fields "with total nitrogen exceeding Spray
Permit limitations [that] has contaminated, and is continuing to contaminate, the surficial aquifer
used as a drinking water resource by neighboring residences." D.I. 1 ¶33. In the Proposed CD,
Mountaire agreed—with no deadlines—to upgrade its wastewater treatment plant, but inexplicably
needed to do virtually *nothing in the meantime* to address its ongoing contamination of the
groundwater and surface water during the minimum of three to five years that will be required for
Mountaire's upgraded treatment system to become functional.

DNREC acknowledged in the Proposed CD that Mountaire will be unable to maintain
compliance with its spray irrigation permit until the full wastewater treatment plant upgrade is
completed, and interim measures "have not and cannot consistently achieve full compliance." D.I.

---

[3] The CIB, a nonprofit organization created by the Delaware Legislature (*see* 7 Del. C. 7601 *et seq*) 25 years ago to preserve, protect and restore Delaware's Inland Bays, filed comments with DNREC on March 2, 2020 (*See* Ex K), pointing out many of the same inadequacies in the Proposed CD that Intervenors raised with DNREC and Mountaire on January 17, 2020 (D.I. 68).

63 ¶¶16-17. During this implementation period, *billions* of gallons of partially treated wastewater containing at least twice the allowable level of nitrogen will be sprayed on fields. *See* Ex A. Norcross Aff. at 3.[4]

## ARGUMENT

### Mountaire is Violating the CWA by Discharging Pollutants into Adjoining Surface Waters Without a Required CWA Permit.

In *Maui*, the Supreme Court held that the CWA permit requirement extend to wastewater discharges from a point source that are the functional equivalent of direct discharges. *Id.*, 2020 WL 1941966, at *3. The Court found CWA jurisdiction over a county's deep-well injection of partially treated wastewater that traveled through the groundwater to surface water a half mile away. *Id.* at *4. The Court rejected EPA's recent Interpretive Statement, 84 Fed. Reg. 16810 (2019), which would have precluded CWA permit requirements for discharges to groundwater even when they pollute surface water. *Id.* at *8.

Mountaire's wastewater treatment and disposal operations *adjoin* Swan Creek, Indian River, and the L&T Tax Ditch. Mountaire collects and partially treats approximately two million gallons of nitrogen-laden wastewater each day. It then sprays the wastewater from a series of large irrigation devices onto fields that border the surface waters. These devices are "point sources," which by definition include "any discernible, confined and discrete conveyance … from which pollutants may be discharged, including any "container," "pipe," "ditch" or "conduit." *See*

---

[4] Under the Court's December 17, 2019 Order (D.I. 67), Intervenors filed extensive objections to the Proposed CD to Mountaire and DNREC (D.I. 68) which included many of the issues presented here. DNREC has not responded to any of the objections, and settlement discussions between Intervenors and Mountaire were terminated on April 30, 2020. Meanwhile, Mountaire and DNREC have again been meeting secretly. And, based on Mountaire's construction permit and spray permit modification posted on DNREC's website on April 30, 2020, Intervenors and their experts do not believe most of the concerns raised by Intervenors on January 17 are being addressed.

*Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994) (tank trucks applying sludge are point sources), *U.S. v. Oxford Royal Mushroom Products, Inc.,* 487 F. Supp. 852, 854 (E.D. PA 1980) (spray irrigation of wastewater is a point source).

Mountaire's wastewater contains elevated levels of nitrates even after the wastewater has been "treated" by crop uptake of nitrogen, as shown by lysimeter readings persistently three to five times above the drinking water standard. *See* Ex C, Cohen Report at 8. The discharge of wastewater with excess nitrogen constitutes the discharge of waste. *Cf.. CARE v. Cow Palace*, 80 F.Supp.3rd 1180 (E.D. WA 2015) ("*Cow Palace*"). As in *Maui*, Mountaire's wastewater percolates to and contaminates the groundwater, which then finds its way to the nearby surface waters. The *Maui* defendant was a half mile from a navigable water; Mountaire's spray fields adjoin a protected estuary and its tributaries and the groundwater travels rapidly through sandy soils for a distance of only 20 to 200 feet to reach these waterways. *See* Ex. C, Cohen Report at 5.[5]  Over the years, these surface waters have become grossly contaminated with nitrates immediately downgradient of Mountaire's spray and sludge fields. *Id.* at 5-6. Mountaire violates the Clean Water Act by discharging pollutants from a point source without a permit into jurisdictional waters. *Maui, supra*.[6]

**Mountaire Is Disposing of Solid Waste in Violation of RCRA**

While in some circumstances land application can lead to beneficial reuse of wastewater by fertilizing the crops and providing a final step in the treatment process, that objective was ignored

---

[5] Mountaire's wastewater also runs off the spray fields into these adjoining waterways, requiring a CWA discharge permit. *See* Ex D, Bauer Report at 3-16.

[6] The affirmative defense to these violations for discharges composed "entirely of return flows from irrigated agriculture," 33 U.S.C. §1342(l)(1), is inapplicable here because Mountaire's discharge is composed of wastewater from an industrial process. *Pac. Coast Federation of Fisherman's Associations v. Glaser,* 945 F.3d 1076, 1085 (9th Cir. 2019).

by Mountaire. For the 20 years Mountaire's spray application of wastewater has simply been a means of disposal of Mountaire's waste.

RCRA defines solid waste as any "...discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations..." 42 U.S.C. § 6903(27). Mountaire sprays fields with wastewater from its high-volume processing of chickens with total nitrogen content many times its permit limit and when there are no crops to fertilize. *See* Ex. D, Bauer Aff. at 2-3, ¶3A. As a result, hundreds of thousands of excess pounds of total nitrogen are applied to fields next to Intervenors drinking water wells. Its application of wastewater during periods when the nitrogen in the spray irrigation could not be taken up by crops and its leaking lagoons constitute the disposal of solid waste.

This case is strikingly similar to the facts in *Cow Palace*. There, the operators of a dairy farm over-applied manure to crop fields and operated leaking lagoons that allowed nitrate not taken up by crops to percolate to the groundwater at levels substantially above the 10-ppm nitrate drinking water standard. *Id.* at 1225-26. The court found that the manure with excess nitrogen and the leaking lagoons constituted the discard of a "solid waste" and that nitrates migrating beneath the crop root zone to the groundwater presented significant human health risks. *Id.* at 1224. On cross-motions for summary judgment, the court granted the citizens' motion and found that Cow Palace violated the Open Dumping and Imminent and Substantial Endangerment provisions of RCRA. *Id.* at 1229.

**Mountaire is Causing or Contributing to Imminent and Substantial Endangerment**

Courts recognize important differences in RCRA imminent and substantial endangerment cases. The statute has "enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of irreparable harm." *U.S. v. Price*, 688 F.2d 204, 211 (3d Cir. 1983). Also, the

reviewing court applies a standard of "clear error" to the trial court's findings on endangerment. *Interfaith Cmty. Org. v. Honeywell Int'l*, 399 F.3d 248, 257 (3d Cir. 2005). "Clear error exists only if a finding is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data." *Id.* In sum, this Court has very broad RCRA authority to determine whether there is or may be ongoing endangerment to public health or the environment and to enjoin it.

The RCRA imminent endangerment provision is violated by any "past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid . . . waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. §6972(a)(1)(B). Mountaire is a generator of solid waste and causes imminent and substantial risks to human health and the environment by storing, applying, and disposing of liquid and solid waste through "discharge, deposit, injection, *dumping*, spilling, leaking, and placing of any solid waste into or on any land or water so that such solid waste … or any constituent thereof *may* enter the environment or be emitted into the air or discharged into any waters. 42 U.S.C. § 6903(3) (emphasis added).

The leading case on imminent and substantial endangerment in in this circuit is *Interfaith, supra*. Reviewing the trial court's grant of injunctive relief to citizens suing under the RCRA citizen suit provisions, the court explained "imminent and substantial endangerment":

> The operative word is "may." Plaintiffs need only demonstrate that the waste "may present" an imminent and substantial threat. Similarly, the word "endangerment" means a threatened or potential harm and does not require proof of actual harm. The endangerment must also be "imminent" meaning threatens to occur immediately. . . .[A]n endangerment is substantial if it is "serious" to the environment or health.

*Id.* 399 F.3d at 258 (quoting *Parker v. Scrap Metal Process.*, 386 F.3d 993, 1015 (11th Cir. 2004)).

The evidence of endangerment here could not be clearer. DNREC, EPA, the CIB, and the experts all attribute the levels of nitrates in the groundwater ranging up to 50 ppm (as compared to the 10-ppm drinking water standard) to Mountaire's 20-year history of soaking the fields with nitrogen-laden waste grossly in excess of its permit limits. Mountaire tries to blame others for elevated groundwater nitrates—septic systems, prior chicken farms, etc.—but those claims are of no consequence in the RCRA context. The statute only requires evidence that Mountaire "has contributed to or is contributing to … the disposal of solid waste." 42 U.S.C. 6972(a)(1)(B). Whether Mountaire is solely or even primarily responsible for the groundwater contamination is not the issue. Its twenty-year history of drenching the fields with grossly excessive amounts of nitrogen-laden waste most certainly has contributed to the disposal of solid waste.

Although Intervenors have no burden to show that Mountaire caused the current levels of groundwater contamination in the region, they are ready to present compelling evidence that Mountaire's past and ongoing practice of wastewater and sludge disposal is the culprit.  From 2010 through 2019, Mountaire's percolate under its spray fields has exceeded the federal drinking water standard  by a multiple of three to more than five times on an annual average, levels that also significantly exceed DNREC's water quality standards for adjoining Swan Creek and Indian River. *See* Ex. C, Cohen Report at  5-6. That percolate is solely attributable to Mountaire.

Dr. Zeman has reported that contaminated drinking water with nitrates at 5 ppm  and above are a hazard to human health. *See* Ex. B. The CIB has found that the excessive discharge of nitrogen from Mountaire's spray irrigation facilities is a significant contributor to the degradation of Indian River and Swan Creek. *See* Ex I.  There can be no doubt that Mountaire is "causing or contributing" to this nitrate contamination that "may" present an imminent and substantial endangerment to human health and the environment. Even DNREC's Verified Complaint finds this to be so. *See* D.I,

1, 5, ¶¶ 31-33. Because the Proposed CD fails to stop this ongoing damage to Intervenors' drinking water and to the nearby surface waters and because Mountaire's high level of production with inadequate wastewater treatment relentlessly continues and will continue for at least three to five years, Mountaire is violating RCRA by creating an imminent and substantial endangerment to human health and the environment in the area of its Millsboro plant.

### Mountaire in Engaged in "Open Dumping" in Violation of RCRA

On top of presenting an imminent and substantial endangerment to human health and the environment under RCRA, 42 U.S.C §6972(a)(1)(b), Mountaire's improper disposal of a "solid waste" is also "open dumping" in violation of RCRA §6945(a). EPA has defined by regulation what constitutes "open dumping" to include the contamination of any underground drinking water source beyond the solid waste boundary of a disposal site. 40 C.F.R. § 257.3-4(a),(c)(4). Just as DNREC alleged in its verified complaint, D.I. 1 at 6, ¶ 36, Mountaire's spray irrigation of wastewater with excessive levels of total nitrogen and its leaking lagoons each constitute "open dumping"  violations under RCRA that continue to contaminate an underground drinking water source well beyond Mountaire's property boundaries. *See* Ex C, Cohen Report at Figs. 1, 2 and 3.

### DNREC's Administrative Failure

In *Interfaith*, the New Jersey Department of Environmental Protection ("NJDEP") had observed Honeywell's mound of chromium contaminated waste next to a surface water and "yellow-green plumes" for twelve years before the citizen suit was filed. NJDEP did nothing for five years, then ordered Honeywell to install an asphalt cap as an "interim measure," acknowledging the cap would not prevent chromium discharges. Ten years after this interim measure, Honeywell entered a consent order requiring it to develop a permanent solution following a process of delineation, analysis of remedial alternatives, and selection of a remedy.  Honeywell took none of

13

these steps. On this history, the trial court found Honeywell guilty of "dilatory tactics" and that NJDEP had an "inability" to "deal effectively with those tactics." *Id.*, at 265-266.

Mountaire entered an administrative order on consent ("AOC") with EPA in 2003. In the AOC, EPA found, among other things, that the Mountaire's Millsboro facility had caused or contributed to nitrate contamination of the drinking water aquifer and that at least 10 residential wells exceeded the drinking water standard for nitrate. *See* Ex. L  at  4, ¶28. Mountaire agreed to implement a groundwater remediation program to reduce annual nitrate levels in groundwater to below 10 mg/l. *Id.* at 6, ¶38. Mountaire did nothing to fulfill its remediation obligation. EPA also told Mountaire that "high levels of nitrate in water can lead to 'blue baby syndrome' that can be fatal and that prolonged intake of high levels of nitrate have been linked to gastric problems and hypertension. *Id.* at 3, ¶19.[7] Despite these warnings, Mountaire continued to spray more than 10 *billion* gallons of wastewater effluent and dispose of millions of gallons of liquid sludge containing high levels of nitrate-forming nitrogen and other contaminants on lands adjacent to Intervenors' homes and drinking water wells over the next 17 years.

In 2010, DNREC wrote to Mountaire advising that it may be causing groundwater exceedances and required Mountaire to begin measuring nitrates in its percolate. *See* Ex C, Cohen Report at 8.  Despite the data submitted during the ensuing nine years showing that Mountaire's percolate, which drops directly to the groundwater, grossly exceeded the drinking water standard, DNREC did nothing. In its 2017 NOV, following Mountaire's catastrophic wastewater treatment failure, DNREC stated that Mountaire's "[g]roundwater monitoring wells have consistently exceeded the drinking water standard of 10 [ppm] for [nitrate] and have shown no improvement

---

[7] Intervenors suffer from these and other health effects caused by drinking water contaminated by Mountaire's wastewater operations. *See, e.g.*, Ex. J ¶4.

since Mountaire acquired ownership of the facility in May of 2000." *See* Ex. E at 10, ¶ 8. Yet DNREC's Proposed CD does not require Mountaire to treat any of the groundwater until the treatment plant upgrade is completed (in at least 3-5 years), and even then is not required to treat all the groundwater it has contaminated but merely that small portion used as process water for its chicken production and no more. *See* D.I. 63 at 17-18 ¶50 and its Ex H at 2.B. In other words, chicken production needs ultimately cap how much groundwater Mountaire must remediate.[8]

The CIB Report found two years ago that the excessive discharge of nitrogen from Mountaire's spray irrigation is a significant contributor to the degradation of Indian River and Swan Creek. *See* Ex. I. Yet DNREC has done nothing to abate Mountaire's ongoing discharge of nitrogen to the groundwater, which in turn discharges to and damages the surface water adjacent to its spray fields. *See* Ex. C, Cohen Report. And the Proposed CD does not require Mountaire to take *any* immediate or effective long-term action to prevent the ongoing discharge to Swan Creek and Indian River of thousands of pounds of nitrate annually emanating from beneath its spray fields and sludge disposal areas that has allowed to percolate to the groundwater over the past 20 years. *Id.*

Mountaire's spray irrigation permit prohibits Mountaire from operating its wastewater treatment and spray irrigation systems in a manner that causes the groundwater to exceed the drinking water standard for nitrates. *See* Ex. M at 20, Part III.A.1. Over nineteen years, Mountaire has increased production while totally disregarding and grossly exceeding the nitrogen limits in its permits, including exceeding by more than *one million* pounds the limit on nitrogen to be deposited on its spray fields between 2000 and 2019. *See* Ex. D, Bauer Aff. These exceedances, compounded by Mountaire's spraying of wastewater during periods of time when there is limited or no crop

---

[8] This approach to remediation of contaminated groundwater is "inappropriate, ineffective, and inconsistent with industry practice." *See* Ex. C, Cohen Letter at 3.

uptake, have caused the groundwater to consistently exceed the drinking water standard for nitrate as acknowledged by DNREC in the 2017 NOV. *See* Ex. E at  10, ¶ 8.  Yet DNREC has not required Mountaire  to take any immediate action and the Proposed CD allows Mountaire to continue to spray partially treated wastewater that will cause the groundwater to violate the drinking water standard for nitrate and contribute significantly to surface water standard exceedances for an indefinite period with no immediate or comprehensive requirement to remediate the groundwater it has contaminated over the past 20 years. Just as the *Interfaith* trial court found that Honeywell had a history of "dilatoriness" and that there was "a substantial breakdown in the agency process that has resulted in twenty years of permanent clean-up inaction," *Id.* at 265-66,  the record here shows Mountaire's dilatoriness and DNREC's 20 years of inaction, despite compelling evidence that day in and day out Mountaire was and is contaminating the groundwater and surface waters.[9]

As a result of increasing its production without sufficiently improving its wastewater treatment system, having inadequate storage for wastewater during inappropriate spraying conditions, operating leaking wastewater treatment lagoons, and treating more chicken rendering waste received from its Selbyville processing plant—all of which will persist notwithstanding the Proposed CD—Mountaire continues to violate RCRA's prohibition on "open dumping" of solid waste and causing or contributing to an imminent and substantial endangerment to the health of Intervenors and to the environment. The imperative of Mountaire's daily generation of more than

---

[9] Plaintiffs do not have the burden of proving administrative failure. Still, the facts summarized above prove that this case is not like *Trinity Indus. v. Chi. Bridge & Iron Co.*, 735 F.3d, 131, 140 (3d Cir. 2013), where injunctive relief was denied because the relief sought duplicated the state's remediation scheme and Plaintiffs did not contend that the plan was deficient or ineffective. Rather, this is a case in which huge gaps in the Proposed CD allow Mountaire's continued imminent and substantial endangerment of health and the environment. *Accord PennEnvironment v. PPG Indus., Inc.*, 2019 WL 2210692, at *22 (W.D. Pa. 2019).

two million gallons of wastewater that must be disposed means it will continue to wreak havoc on its neighbors and the environment. Mountaire must be enjoined.

**Injunctive Relief**

This Court has broad powers in equity to issue a preliminary injunction. *Hecht v Bowles*, 321 U.S. 321, 329 (1944). The general requirements for injunctive relief are that a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *State of Delaware Dep't. of Natural Res. and Environmental Control v. U.S. Army Corps of Engineers*, 681 F.Supp.2d 546, 554 (D. Del. 2010) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

The CWA and RCRA empower courts to restrain persons contributing to the disposal of any solid waste and endangering health and the environment. The Courts may "order such person to take such other action as may be necessary" under 42 U.S.C. § 6972(a). In *Interfaith*, the trial court ordered Honeywell to excavate and remove the chromium contamination that was creating an imminent and substantial endangerment, finding that excavation and removal of the contamination from the Site was "necessary" under the statute. The Third Circuit held:

> The injunction's language, read in conjunction with the District Court's findings, confirms the necessity for the injunction within the meaning of RCRA. The injunction only orders Honeywell to excavate and remove contaminated soil and then "remedy" those river sediments that have been contaminated with chromium residue from the Site. . . . Given the record in this case, the injunction is reasonable and narrow, as it requires only what is necessary now to abate the established endangerments.

*Id.*, 399 F.3d 248, 266.

In ordering excavation, the Third Circuit found no conflict with the environmental administrative agency authority. "The reconciliation of such power in the injunctive context. . . is

not difficult." When the defendant caused or contributed to an imminent and substantial endangerment, nothing in the statute precluded the injunctive relief ordered. As long on the ordered relief was "necessary" to abate the endangerment, it was of no consequence whether the administrative agency would have disagreed. *Id*. at 267-68.

Mountaire and DNREC seek to end this case by requiring modest improvements to Mountaire's wastewater treatment system that will take at least three to five years to accomplish. Now and into the future, Mountaire will continue to dispose of its solid waste and violate the CWA while causing an imminent and substantial endangerment to Intervenors and the environment. DNREC has acknowledged that Mountaire can't meet its effluent discharge limits until long-term improvements are made and Mountaire's ramped-up production at its Millsboro plant as well its receiving waste from its Selbyville plant create a daily imperative to dispose of massive amounts of contaminated wastewater. Intervenors' remediation experts have identified the necessary interim measures that can be accomplished by Mountaire over the next 6-12 months to protect public health and the environment from further risk. *See* Ex. N, J. Lawrence Hosmer Aff. ('Hosmer Aff.") and "Interim Remedial Measures Plan" ("IRMP Report"). Mountaire could end its ongoing contamination and endangerment during the next three to five years by obtaining and complying with an appropriate CWA permit, and:

(1) ending receipt of Selbyville waste to be treated and disposed. Ex A, Norcross Aff. ¶3.b.

(2) reducing its production to a level at which its treatment system can achieve compliance with all of its permit limits for nitrogen;  Intervenors' wastewater expert advises that Mountaire must reduce poultry production by at least 50%[10] and likely take other measures to approach the permit discharge limits for total nitrogen. *Id*.

---

[10] Along with the other shortcomings of the Mountaire's "archaic" treatment plant, one of the plant's two nine-million gallon anaerobic treatment lagoons is currently inoperable and will be out of service for a long time, resulting in an up to a 50% overloading of its treatment capability and effluent levels of Total Nitrogen that are two to three times higher than permit limits. *See* Ex A, Norcross Aff. at 3, ¶2.g, and Norcross Letter at 4-5.

(3) constructing additional on-site effluent storage, with a capacity for 90 days, to allow it to store partially treated wastewater when the conditions are inappropriate for crop uptake of nitrogen, such as frozen ground and no crops or crops not adequately reducing the percolate below 10 ppm. *Id.* at 3, ¶2.i; *see also* Ex D, Bauer Report at 21-22.

(4) establishing additional spray irrigation fields amounting to at least 500 acres of land not already exceeding the 10 mg/l drinking water standard for nitrate to spray the stored wastewater during seasons when crops are unable to take up the nitrogen and to provide reserve crop areas to take up the nitrogen when the expected crop is diseased or damaged and cannot utilize the nitrogen *See* Ex D, Bauer Report at 21-22;

(5) investigating and replacing the bottom liner to its aging existing lagoons that DNREC alleges are leaking and stopping the leakage prior to its discharge to the groundwater and Swan Creek, *see.* Ex. A, Norcross Aff. at 3, ¶2.j.

(6) testing all residential wells in the path if its spray irrigation and sludge disposal fields and provide and maintain a safe source of drinking water such as a whole house reverse osmosis treatment, *see* Ex N, IRMP Report at 12 and Fig. 4-2;

(7)  testing Swan Creek, Indian River, and the L & T Tax Ditch for nitrogen compounds and other contaminants and immediately implement a system to intercept contaminated groundwater and runoff from its spray fields to these waterways, *see id.* at 9-12, Fig. 4-1.

The above measures, sought by Intervenors, are "necessary" to abate the ongoing imminent and substantial endangerment Mountaire is causing and contributing to with no plan for near-term abatement and, in many cases, no plan at all.

**Injunctive Relief Serves the Public Interest and Can Be Accommodated by Mountaire**

Mountaire's ongoing contamination of the groundwater creates a health hazard and further damages a protected National Estuary, causing irreparable harm for which there is no adequate remedy at law. Mountaire conducts these operations despite the damage it causes and has increased production and overloaded its existing wastewater treatment capability, thereby exacerbating the risks to public health and the environment.

While a reduction in production at the plant may result in fewer jobs in the short term, these jobs were added because Mountaire increased production while ignoring the need to increase wastewater treatment and storage capacity. Just three months before its treatment plant was crippled, Mountaire's President and CEO pledged to DNREC that the Millsboro plant would shut

down if there were a major mechanical malfunction or human error causing a change in its wastewater discharge that continued and could not be contained by the storage at the plant. *See* Ex F. The catastrophic breakdown in 2017 caused a significant change for the worse in its wastewater quality, yet Mountaire continues to discharge and cannot be heard to complain about a temporary 50% reduction in production. In fact, Mountaire has at least three other poultry processing plants, including another in Sussex County only 13 miles away, to which its employees and reduced production at Millsboro can be transferred until it can meet its public health and environmental requirements under RCRA. Mountaire had the responsibility to improve its wastewater treatment but failed to do so in favor of increased profits. In these circumstances, the balance of hardships and public interest strongly support stopping the ongoing permit and regulatory violations, the continuing open dumping, and the other irresponsible actions of Mountaire until it complies with all required  permits and stops endangering public health and the environment.

## CONCLUSION

As the Third Circuit wrote in *Interfaith*, "[e]nough time has been spent in the history of this matter and the time for clean-up has come." *Id.* at 268. For all the above reasons, Intervenors respectfully urge this court to enjoin Mountaire from (1) discharging pollutants without a CWA permit, (2) open dumping, and (3) causing or contributing to imminent and substantial endangerment to public health and the environment and order the requested actions cited herein as "necessary" to abate the ongoing endangerment.

**BAIRD MANDALAS BROCKSTEDT, LLC**
*/s/ Chase T. Brockstedt*
Chase T. Brockstedt, Esq. (DE Id. No. 3815)
Stephen A. Spence, Esq. (DE Id. No. 5392)
1413 Savannah Road, Suite 1
Lewes, DE 19958
Phone: (302) 645-2262
Chase@bmbde.com

OF COUNSEL:
Philip C. Federico, Esq. (*admitted pro hac vice*)
Brent Ceryes, Esq. (*admitted pro hac vice*)
SCHOCHOR, FEDERICO AND STATON, P.A.
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Dated: May 4, 2020            *Attorneys for Intervenors*